No. 24-1492

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

————

National Wildlife Refuge Association, et al.,
*Plaintiff-Appellees,*

v.

ITC Midwest LLC, et al.,
*Intervenor-Defendants-Appellants.*

————

**On Appeal from the United States District Court
for the Western District of Wisconsin,
Case No. 23-cv-00139
The Honorable William M. Conley, Judge**

————

**BRIEF OF INTERVENOR-DEFENDANTS-APPELLANTS ITC
MIDWEST LLC AND DAIRYLAND POWER COOPERATIVE**

**Perkins Coie LLP**
Thomas Jensen
Stacey Bosshardt
Edward Boling
700 13th Street NW, Suite 800
Washington, DC 20005
(202) 654-6200
TJensen@perkinscoie.com

## DISCLOSURE STATEMENTS

ITC Midwest LLC and Dairyland Power Cooperative (collectively, "Utilities"), together with American Transmission Company LLC, own the Cardinal-Hickory Creek 345-kilovolt Transmission Line Project. ATC and ITC will each own 45.5 percent of the Project, and Dairyland will own the remaining nine percent. Perkins Coie LLP represents ITC and Dairyland collectively.

ITC Midwest LLC, a Michigan limited liability company, is owned by ITC Holdings Corp., its sole member. ITC Holdings Corp.'s sole shareholder is ITC Investment Holdings Inc. FortisUS Inc. owns 80.1 percent of ITC Investment Holdings Inc. FortisUS Holdings Nova Scotia Limited wholly owns FortisUS Inc. Fortis Inc. (Fortis) wholly owns FortisUS Holdings Nova Scotia Limited. Fortis has no parent company, and no publicly held company has a 10 percent or greater ownership interest in Fortis. Eiffel Investment Pte. Ltd. (Eiffel), which is wholly owned by GIC (Ventures) Pte. Ltd. (GIC Ventures), owns 19.9 percent of ITC Investment Holdings Inc. GIC Ventures is affiliated with GIC Private Limited (GIC), an investment company that manages the Government of Singapore's foreign reserves, and GIC Special

Investments Pte. Ltd., the private equity and infrastructure arm of GIC. GIC and GIC Ventures are each wholly owned by the Government of Singapore through the Ministry for Finance, a statutory corporation set up by the Government of Singapore to own and administer government assets. The Ministry for Finance has no parent company, and no publicly held company has a 10 percent or greater ownership interest in the Ministry for Finance.

Dairyland Power Cooperative has no parent company, and no publicly held company has a 10 percent or greater ownership interest in it.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENTS ................................................................. ii

TABLE OF CONTENTS ......................................................................... iv

TABLE OF AUTHORITIES ................................................................... vi

GLOSSARY ............................................................................................. x

JURISDICTIONAL STATEMENT ........................................................ 1

    A.    The District Court's Jurisdiction ............................................. 1

    B.    The Court of Appeals' Jurisdiction ........................................ 2

STATEMENT OF THE ISSUES .............................................................. 3

STATEMENT OF THE CASE .................................................................. 4

    A.    Planning, Development, and Analysis of the Project ............. 4

        1.    Identification of Project by Federal Energy
            Regulatory Commission-approved grid
            operator MISO during regional transmission
            planning ........................................................................ 4

        2.    Federal agency environmental review of
            Nelson-Dewey crossing ................................................ 8

    B.    FWS' Analysis and Approval of the Exchange ..................... 12

    C.    Plaintiffs' Prior Litigation Against the Project's Federal
        Approvals ................................................................................. 17

    D.    Plaintiffs' Litigation Against The Project's Current Federal
        Approvals ................................................................................. 20

SUMMARY OF ARGUMENT ................................................................ 26

ARGUMENT ........................................................................................... 29

A.    Standard of Review ................................................ 29

B.    The District Court Abused Its Discretion by Preliminarily
      Enjoining an Important Infrastructure Project without
      Performing Required Analyses or Applying the Correct
      Standards and Precedent ...................................... 31

      1.    The district court abused its discretion by
            failing to comply with Rule 65's requirement to
            "state the reasons why [the injunction] issued"
            or Rule 52(a)(2)'s requirement to state the
            "findings and conclusions" supporting its
            orders ................................................... 31

      2.    The district court abused its discretion by
            presuming Plaintiffs' entitlement to injunctive
            relief ................................................... 33

      3.    The district court abused its discretion by
            failing to balance the factors required under
            *Winter*. .............................................. 35

      4.    The district court abused its discretion by
            failing to make the findings required under the
            FAST Act. .............................................. 39

      5.    The district court abused its discretion by
            relying on vacated findings that this Court
            instructed would not have "authoritative or
            precedential" effect in any future suit. .......... 41

CONCLUSION ...................................................... 43

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

REQUIRED SHORT APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adkins v. Nestle Purina PetCare Co.,*
779 F.3d 481 (7th Cir. 2015) .......................................................... 32, 36

*Cox v. City of Chicago,*
868 F.2d 217 (7th Cir. 1989) ................................................................ 30

*D.U. v. Rhoades,*
825 F.3d 331 (7th Cir. 2016) ................................................................ 30

*Denofre v. Transp. Ins. Rating Bureau,*
532 F.2d 43 (7th Cir. 1976) .................................................................. 32

*Dupuy v. Samuels,*
465 F.3d 757 (7th Cir. 2006) ................................................................ 33

*Grubhub Inc. v. Relish Labs LLC,*
80 F.4th 835 (7th Cir. 2023) ................................................................ 36

*H. K. Porter Co. v. Nat'l Friction Prod. Corp.,*
568 F.2d 24 (7th Cir. 1977) .................................................................. 31

*Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n,*
721 F.3d 764 (7th Cir. 2013) .................................................................. 6

*Ill. Republican Party v. Pritzker,*
973 F.3d 760 (7th Cir. 2020) .......................................................... 36, 42

*In re A.F. Moore & Assocs., Inc.,*
974 F.3d 836 (7th Cir. 2020) (per curiam) ......................................... 42

*In re Ezell,*
678 F. App'x 430 (7th Cir. 2017) ......................................................... 20

*In re Jimmy John's Overtime Litig.,*
877 F.3d 756 (7th Cir. 2017) ................................................................ 31

*Ind. Forest All., Inc. v. U.S. Forest Serv.*,
  325 F.3d 851 (7th Cir. 2003) ............................................................ 38

*Koon v. United States*,
  518 U.S. 81 (1996) ............................................................................ 30

*Lawson Prod. Inc. v. Avnet, Inc.*,
  782 F.2d 1429 (7th Cir. 1986) .......................................................... 30

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .......................................................... 28, 33, 35

*Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*,
  580 F. Supp. 3d 588 (W.D. Wis. 2022), *vacated by Driftless
  Area Land Conservancy v. Rural Utils. Serv.*, 74 F.4th 489
  (7th Cir. 2023) .......................................................... 17, 18, 19

*Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*,
  No. 21-cv-096-WMC, 2021 WL 5050073 (W.D. Wis. Nov. 1,
  2021) .......................................................... 18, 20, 37

*Nelson v. Welch*,
  684 F.3d 684 (7th Cir. 2012) ............................................................ 43

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................... 36

*Tully v. Okeson*,
  78 F.4th 377 (7th Cir. 2023) ............................................................ 38

*United States v. Ali*,
  619 F.3d 713 (7th Cir. 2010) ............................................................ 26

*United States v. Bell*,
  5 F.3d 64 (4th Cir. 1993) .................................................................. 42

*United States v. Chemical Found.*,
  272 U.S. 1 (1926) ............................................................................. 34

*United States v. Polland*,
  56 F.3d 776 (7th Cir. 1995) .............................................................. 42

*Valencia v. City of Springfield*,
  883 F.3d 959 (7th Cir. 2018)..........................................................30

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008)
  ..............................................3, 21, 24, 28, 30, 31, 32, 33, 35, 36

## STATUTES

5 U.S.C. § 706 ...........................................................................35

5 U.S.C. §§ 701–706.................................................................1

16 U.S.C. §§ 668dd–668ee .....................................................1

16 U.S.C. §§ 791-825r ............................................................5

28 U.S.C. § 1292(a)(1)............................................................2

28 U.S.C. § 1331 .....................................................................2

42 U.S.C. §§ 4321–4370m ......................................................1

42 U.S.C. § 4370m ................................................................39

42 U.S.C. § 4370m-6(a)........................................................39

42 U.S.C. § 4370m-6(a)(1)(A) ..............................................40

42 U.S.C. § 4370m-6(b)........................................................41

42 U.S.C. § 4370m-6(b)(1) ...................................................39

42 U.S.C. § 4370m-6(b)(1)-(2)..............................................39

Fixing America's Surface Transportation Act of 2015, Pub. L.
  No. 114-94, 129 Stat 1312 (Dec. 4, 2015) ...........3, 27, 39, 40

## RULES

Fed. R. App. P. 4(a)(1)(B) .......................................................3

Fed. R. Civ. P. 52...................................................3, 27, 31, 32

Fed. R. Civ. P. 62(c) ................................................................ 24, 25

Fed. R. Civ. P. 65 ..................................................................... 3, 26

Fed. R. Civ. P. 65(d) ............................................................ 31, 32, 33

**REGULATIONS**

7 C.F.R. § 1970.5(b)(3)(iii) ............................................................ 9

18 C.F.R. § 35.34(k)(7) .................................................................. 5

**OTHER AUTHORITIES**

OFF. OF MGMT. & BUDGET, EXEC. OFF. OF THE PRESIDENT,
    Memorandum for Heads of Federal Departments and
    Agencies, M-17-14, Guidance to Federal Agencies
    Regarding the Environmental Review and Authorization
    Process for Infrastructure Projects, Jan. 13, 2017,
    https://www.whitehouse.gov/wp-
    content/uploads/legacy_drupal_files/omb/memoranda/201
    7/m-17-14.pdf ...................................................................... 40

U.S. Senate Comm. on Env't and Public Works, H.R. 22,
    Joint Explanatory Statement of the Committee of the
    Conference, Division a Surface Transportation,
    https://www.epw.senate.gov/public/_cache/files/9/8/989e5d
    98-8847-45cc-b9e0-
    4510f56d652a/C212CC07CE890FB80E83A45B2C5C858C.
    joint-explanatory-statement.pdf............................................. 40

# GLOSSARY

| Acronym | Definition |
|---|---|
| App'x | Appellants' Appendix |
| ATC | American Transmission Company LLC and ATC Management Inc. |
| Commission | Federal Energy Regulatory Commission |
| Corps | U.S. Army Corps of Engineers |
| Dairyland | Dairyland Power Cooperative |
| DALC | Collectively, Plaintiffs National Wildlife Refuge Association, Driftless Area Land Conservancy, and Wisconsin Wildlife Federation |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FAST Act | Fixing America's Surface Transportation Act of 2015 |
| Federal Defendants | Rural Utilities Service, Andy Berke, Administrator, Rural Utilities Service, U.S. Fish and Wildlife Service, Will Meeks, Midwest Regional Director, and Sabrina Chandler, Manager, Upper Mississippi River National Wildlife and Fish Refuge, U.S. Army Corps of Engineers, Lieutenant General Scott A. Spellmon, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, Colonel Jesse T. Curry, Commander and District Engineer, Rock Island District, U.S. Army Corps of Engineers, and Colonel Eric Swenson, Commander and District Engineer, St. Paul District, U.S. Army Corps of Engineers |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish and Wildlife Service |

| ITC | ITC Midwest LLC |
|---|---|
| MISO | Midcontinent Independent System Operator, Inc. |
| NBA | Net Benefit Analysis |
| NEPA | National Environmental Policy Act |
| Project or CHC Project | Cardinal-Hickory Creek 345-kilovolt Transmission Line Project |
| Refuge | Upper Mississippi River National Wildlife and Fish Refuge |
| Refuge Act | National Wildlife Refuge System Administration Act, as amended by the National Wildlife Refuge System Improvement Act of 1997 |
| RUS | Rural Utilities Service |
| SEA | Supplemental Environmental Assessment |
| Utilities | ITC Midwest LLC and Dairyland Power Cooperative |

## JURISDICTIONAL STATEMENT

**A.    The District Court's Jurisdiction**

In this case, Plaintiffs[1] seek declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, for alleged violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m, and the National Wildlife Refuge System Administration Act ("Refuge Act"), 16 U.S.C. §§ 668dd–668ee. The claims arise out of Federal Defendants'[2] environmental review of and authorizations for a land exchange ("Exchange") between the U.S. Fish and Wildlife Service ("FWS") and the Utilities related to the siting of the proposed Cardinal-Hickory Creek 345-kilovolt Transmission Line Project ("Project").

---

[1] Plaintiff-Appellees National Wildlife Refuge Association, Driftless Area Land Conservancy, and Wisconsin Wildlife Federation are collectively referred to as "Plaintiffs."

[2] Rural Utilities Service, Andy Berke, Administrator, Rural Utilities Service, U.S. Fish and Wildlife Service, Will Meeks, Midwest Regional Director, and Sabrina Chandler, Manager, Upper Mississippi River National Wildlife and Fish Refuge, U.S. Army Corps of Engineers, Lieutenant General Scott A. Spellmon, Chief of Engineers and Commanding General, U.S. Army Corps of Engineers, Colonel Jesse T. Curry, Commander and District Engineer, Rock Island District, U.S. Army Corps of Engineers, and Colonel Eric Swenson, Commander and District Engineer, St. Paul District, U.S. Army Corps of Engineers are collectively referred to as "Federal Defendants."

The district court exercised jurisdiction over the case under 28 U.S.C. § 1331 because Plaintiffs' claims raise federal questions under the Administrative Procedure Act, NEPA, and the Refuge Act.

## B.    The Court of Appeals' Jurisdiction

The Seventh Circuit has jurisdiction over this appeal because it is an appeal from "[i]nterlocutory orders of [a] district court[] of the United States … granting … [an] injunction." *See* 28 U.S.C. § 1292(a)(1). The Utilities seek review of the district court's March 21, 2024 one-sentence text-only order ("Text Order") preliminarily enjoining Defendants "from closing on any land exchange involving the [Refuge] before the court issues its decision on the pending motion for preliminary injunction," App'x 1–2[3], March 25 Order purporting to continue the Text Order and ordering additional briefing on the preliminary injunction issues ("Continuation Order"), App'x 3–7, and Preliminary Injunction Order, App'x 8–9 (collectively, "Orders"), which enjoined Federal Defendants and the Utilities "from taking any action to close the land exchange agreement or begin construction on [the Project] until after this court has

---

[3] "App'x" cites are to Appellants' Required Short Appendix (App'x 1 through 76) and Appellants' Appendix (App'x 77 through 1266).

an opportunity to review and consider the relevant administrative record … and issued a decision on whether to continue plaintiffs' preliminary injunction further." App'x 7–8. The Utilities timely appealed these orders on March 29, 2024, concurrently with the filing of a docketing statement. App'x 959. *See* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.  Whether the district court abused its discretion by failing to comply with the requirements under Federal Rules of Civil Procedure 65 and 52 to state the reasons for the injunction when issuing the Orders;

2.  Whether the district court abused its discretion by improperly presuming that Plaintiffs were entitled to an injunction;

3.  Whether the district court abused its discretion by failing to consider the required factors under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), before issuing the "extraordinary remedy" of an injunction;

4.  Whether the district court abused its discretion by failing to comply with the requirements of the Fixing America's Surface Transportation (FAST) Act; and

5.  Whether the district court abused its discretion by relying on a decision this Court stated should have "no authoritative or precedential effect" in any future suit.

## STATEMENT OF THE CASE

### A.  Planning, Development, and Analysis of the Project

#### 1.  Identification of Project by Federal Energy Regulatory Commission-approved grid operator MISO during regional transmission planning

The Project is a 101-mile, 345-kilovolt transmission line from Dubuque County, Iowa to Madison, Wisconsin. The Project primarily crosses private and non-federal land. More than 90 percent of the Project is constructed, and the eastern half is in service. The Project's route includes a 1.1-mile segment that crosses FWS land inside the 261-mile-long Upper Mississippi River National Wildlife and Fish Refuge ("Refuge"). The Refuge is already bisected by the Utilities' existing nearby transmission lines. Those lines cross the Refuge on a corridor to the south (downriver) from the proposed new corridor along Oak Road. The existing transmission line corridor generally parallels the proposed new corridor and is about a mile away at the farthest (the "Stoneman Crossing"). App'x 210. The Utilities and another co-owner have already invested approximately $650 million to develop and build the Project and

place it into service. App'x 953 ¶ 6.

The need for the Project was recognized more than a decade ago by Midcontinent Independent System Operator, Inc. "(MISO"), the regional transmission organization regulated by the Federal Energy Regulatory Commission ("Commission"). App'x 1113–1114 (explaining role of Commission and regional transmission organizations); App'x 1115–1117 (explaining role of MISO and Co-owners in MISO process). MISO is responsible under the Federal Power Act, 16 U.S.C. §§ 791-825r, for transmission expansion and reliability planning in the MISO region. *See* 18 C.F.R. § 35.34(k)(7). As part of a larger multi-decade planning effort to address challenges presented by the nationwide transition from fossil fuels to clean generation, MISO conducted a three-year study (2008–2011) of Multi-Value Projects ("MVPs") that would promote energy delivery in the region. App'x 1185. During that time, MISO held more than 200 meetings and devoted 35,000 hours of staff time to the planning process. App'x 867 ¶ 8; App'x 1005.

MISO's effort culminated in 2011 with the identification of 17 projects (including this one) that are intended to provide economic, reliability, and public policy benefits across the MISO region (the "MVP

Portfolio"). App'x 1085–1086. *See also Ill. Com. Comm'n v. Fed. Energy Regul. Comm'n*, 721 F.3d 764, 774 (7th Cir. 2013) ("every multi-value project is to be large, is to consist of high-voltage transmission (enabling power to be transmitted efficiently across pricing zones), and is to help utilities satisfy renewable energy requirements, improve reliability (which benefits the entire regional grid by reducing the likelihood of brownouts or outages, which could occur anywhere on it), facilitate power flow to currently underserved areas in the MISO region, or attain several of these goals at once") (citation omitted). MISO's analysis projected that the MVP Portfolio would provide average annual benefits of $1.27 billion over the first 40 years of service, in addition to improving regional grid reliability and helping States to meet renewable energy goals and mandates. *See* App'x 721. Now, nearly 13 years after the MVP Portfolio was approved, the Project is still needed and is essential for the long-term reliability of the MISO grid. App'x 867–868 ¶ 10. It is the only one of the 17 projects in the Portfolio not yet completed. App'x 655 ¶ 10; App'x 875 ¶ 9. As MISO's Director of Resource Utilization attests, it remains critical for the long-term reliability of the MISO grid that the Project be completed. App'x 867–868 ¶ 10; *see also* App'x 654–655 ¶¶ 6, 8–9.

By connecting regions rich in renewable generation, like Iowa, to homes and businesses east of the Mississippi River, the Project will reduce congestion and increase access to cost-effective renewable energy sources. App'x 875–876, 879 ¶¶ 11, 19. These and all the other important public benefits that MISO envisioned will be foregone as long as the Orders remain in place. App'x 875 ¶ 9.

Until the Project is in service, the grid will also be less reliable and secure, creating the potential for "cascading outages in southwestern and south-central Wisconsin." App'x 215, 221. The Project is part of MISO's plan to provide a robust transmission system that can meet demand during peak summer and winter hours and withstand extreme weather events. App'x 870 ¶ 14; App'x 927 ¶ 14. It will improve reliability during times when the system is under stress and demand is high. App'x 927 ¶ 14; App'x 876 ¶ 13. These benefits cannot be realized until the Project is completed. App'x 929 ¶ 18.

At the local level, a 161-kilovolt transmission line that has already been taken out of service for Project construction must remain inactive until construction is complete. App'x 888 ¶¶ 18–19. This reduces the redundancy and resiliency of the local transmission grid. App'x 888 ¶ 18.

Further delay also hinders regional efforts to promote access to lower-cost renewable energy and reduce regional greenhouse gas emissions. Roughly 24,000 megawatts of electricity from more than 160 solar and wind power plants are conditioned on the Project's final completion. App'x 924–925 ¶ 10; App'x 871 ¶ 15. These generators may not be allowed to deliver their full output until the Project is in service, App'x 923–924 ¶ 8. According to Dr. Anne Smith, an economist and decision analyst who has specialized in environmental risk assessment and cost-benefit analysis for 40 years, for every gigawatt (1,000 megawatts) of wind capacity delayed for a 12-month period, carbon dioxide emissions are estimated to increase 1.5 to 3.9 million tons. App'x 945–946 ¶ 27.

### 2. Federal agency environmental review of Nelson-Dewey crossing

MISO's extensive review of the Project was followed by intensive environmental review by three federal agencies. Their review occurred in three different phases. In 2016, the Rural Utilities Service ("RUS"), which reviewed the Project in anticipation of a possible future application for federal funding by Dairyland under the Rural Electrification Act, began preparing an Environmental Impact Statement ("EIS"). App'x 1007. RUS served as lead agency for the EIS, and FWS and the U.S. Army

Corps of Engineers ("Corps"), which also planned to make decisions about the Project within their respective jurisdictions based on the environmental analysis, served as cooperating agencies. The Utilities prepared, and the agencies reviewed, three documents analyzing system and routing alternatives, including alternatives that crossed the Mississippi River at several administrative (non-federal) gaps in the 261-mile-long Refuge: the Alternatives Evaluation Study, the Alternative Crossing Analysis, and the Macro-Corridor Study. App'x 1026–1028; 7 C.F.R. § 1970.5(b)(3)(iii) (requiring applicants to develop reasonable alternatives for meeting their purpose and need). The information provided in these studies is discussed extensively and incorporated by reference in the Final EIS, which RUS published in 2019, App'x 1011, and in a January 16, 2020, Record of Decision documenting the agencies' approval of the selected alternative, signed by RUS, FWS, and the Corps. App'x 1083, 1088–1090. Plaintiffs submitted scoping comments, comments on the Draft EIS, and comments on the Final EIS during the comment periods provided. App'x 406–445, 446–526, 527–565.

FWS, based on its consideration of the information in the more than 1,200-page Final EIS (including a chapter devoted to impacts within the Refuge, App'x 1036–1062), as well as a Biological Opinion analyzing any impacts on threatened and endangered species or their habitat, issued a right-of-way for the Project to cross the Refuge at the Nelson-Dewey crossing. That crossing follows a route across the river to the Nelson-Dewey substation property (a retired coal plant) northwest of Cassville, Wisconsin. The route parallels Oak Road, an existing gravel road through the Refuge used principally by passengers on a ferry that travels to and from Cassville). App'x 1063–1082; App'x 1091–1101. In 2021 (before summary judgment briefing had begun in Plaintiffs' earlier environmental litigation), FWS discovered that it had relied on incorrect easement documents and revoked the right-of-way permit. App'x 568–570. FWS affirmed that the agency was, instead, evaluating the Utilities' proposal for a land exchange that would (if approved) enable the Project to cross the Mississippi River at the Nelson-Dewey crossing. App'x 569.

In October 2021, the Utilities and FWS executed a "Statement of Proposed Land Exchange," outlining the terms that the parties intended to include in the event FWS, after careful review, decided to enter into a

final land exchange agreement. App'x 571–576. The proposed exchange was described and analyzed in the Supplemental Environmental Assessment ("SEA"), App'x 1111–1112, and the Statement of Proposed Land Exchange was attached as "Appendix A" to the Draft SEA that was released for public comment. App'x 1224–1230.

On September 8, 2023, RUS published a notice of a Draft SEA.[4] App'x 1266. The Draft SEA addressed minor route modifications at sites outside the Refuge, but also included analysis of a modification to the Nelson-Dewey route to avoid tribal cultural resources. App'x 1111–1112. The Draft SEA explained that FWS was no longer considering a right-of-way permit, but rather a proposed land exchange agreement, to enable the Project to cross the Mississippi River at the Nelson-Dewey crossing and run east and west along Oak Road. App'x 1112. The Draft SEA was subject to an additional 14-day public comment period, App'x 1266, during which Plaintiffs submitted 40 pages of comments. App'x 577–620. Ten pages of their comments were devoted to the proposed exchange. App'x 586–595.

---

[4] In June 2021, RUS prepared an Environmental Assessment to analyze discrete route modifications not germane here. App'x 201.

On October 6, 2023, RUS issued a Final SEA and Finding of No Significant Impact with respect to the various route modifications. App'x 192–405; App'x 621–652. On February 22, 2024, FWS issued a Finding of No Significant Impact ("FONSI") specifically focused on the route modification through the Refuge and the proposed Exchange. App'x 77–97. The FONSI documents FWS' analysis and concludes that the impacts of the changes analyzed in the SEA (i.e., the proposed Project route modification and Exchange) are not significant and do not require a supplemental EIS. App'x 96. On February 23, 2024, FWS entered into the Exchange Agreement ("Agreement") with the Utilities. App'x 99–115.

Every environmental review the agencies conducted, and the alternative routing analyses incorporated by reference into the Final EIS, demonstrated that the Nelson-Dewey route was the preferred alternative based on its impacts and ability to fulfill the purpose and need for the agencies' action. App'x 184–185.

## B.    FWS' Analysis and Approval of the Exchange

Under the Exchange proposed by the Utilities, the Utilities would receive the "19-acre corridor along portions of Oak Road that was evaluated as a proposed [right-of-way] in the FEIS." App'x 205. They

would use the Oak Road tract to build the Project on FWS' preferred route through the Refuge, instead of using their existing easements at the Stoneman Crossing, the existing nearby transmission line corridor that crosses the Refuge and connects to the Stoneman substation across the river. FWS found that the Utilities' use of the Stoneman route for the Project would cause substantially greater adverse environmental and other impacts on and off the Refuge. App'x 188–189; *see infra* p. 14–15. No party prefers use of the Stoneman crossing for the Project, and the FWS analyses explain why the Oak Road route is far superior.

Per the Agreement ultimately approved and executed by FWS, FWS will receive 35.69 acres of land within the Refuge boundaries with "tremendous conservation value" that the agency has sought for 15 years because of its "unique and irreplaceable" value as habitat for wildlife species. App'x 99; App'x 185–186; App'x 95; *see also* App'x 87 (absent Exchange, Refuge would not meet its "purpose or mission" because it would "miss the opportunity to acquire [a] tract … listed as a high priority acquisition" in Refuge's planning documents). In exchange, the Utilities will receive the 19.84 acres of lower-quality land along Oak Road. App'x 186. The Utilities would remove the two existing

transmission lines in the Stoneman corridor pursuant to an approved decommissioning plan, restore the rights-of-way consistent with an approved restoration plan, and release the associated 28.1 acres of rights-of-way. The decommissioning of the Stoneman route would also result in removal of 30 transmission structures from the Refuge (a net decrease of 19 structures). App'x 187; App'x 100–101 ¶ 6.E–F. The restoration of these rights-of-way will reduce habitat fragmentation in the Refuge. App'x 187.

Under the Agreement, the Utilities will also surrender the "perpetual rights-of-way" where their existing lines now cross the Village of Cassville. App'x 187; App'x 1029–1034. FWS' analysis found that the Exchange will eliminate the risk of the Utilities building the Project along the Stoneman route through the Refuge using their existing easements, which would not require either a land exchange or a compatibility determination. App'x 189. FWS concluded that use of the Stoneman route would have greater adverse impacts both on and off the Refuge because it would mean that (1) transmission lines would continue to fragment more sensitive wetland habitat; (2) FWS would lose the opportunity to "consolidate [habitat] fragmentation along Oak Road"; (3)

14

the Project's transmission towers in the Refuge would need to be much taller (up to 200 feet) to stay within the width of the existing easements, which would create adverse visual and avian impacts; and (4) the Project would have impacts to residences, churches, schools, and a municipal airport in the Village of Cassville. App'x 189; *see also* App'x 87 (noting "high risk" that the Utilities would have to use existing easements, which would require "construction of towers twice as tall"); App'x 88 (Stoneman build-out would have "greater adverse impacts to migration corridors and bird species").

To reduce the potential for avian collisions, the Project, if built along Oak Road, will use specialized low-profile (75-foot-tall) transmission structures to match the existing tree canopy in the Refuge; place all of the wires on a single horizontal plane; and use avian flight diverters. App'x 90–91; App'x 911 ¶ 55. The Agreement also includes deed restrictions that will allow FWS to enforce the various environmental protection measures. *See, e.g.*, App'x 101 ¶ 6.D; App'x 187 (requiring Utilities to follow an approved vegetation management plan that prescribes the native species to be planted in the transmission line footprint and measures to minimize soil disturbance and control invasive

species); App'x 101–102 ¶ 6.F; App'x 91 (requiring Utilities to use helicopters when removing existing lines to ensure that they do not contact the river bottom during the decommissioning).

To comply with NEPA, FWS analyzed the environmental impacts of the Project in the EIS, EA, SEA and FONSIs. To comply with the Refuge Act, FWS prepared a Net Benefit Analysis ("NBA") to determine whether the land exchange would achieve a net conservation benefit for the Refuge. App'x 184. The NBA relied on the federal agencies' extensive environmental review of the Project completed over the last decade, including the 2016 Alternative Crossing Analysis, the 2019 Final EIS, and the 2023 SEA. App'x 184. In the NBA, FWS made detailed findings and concluded that the Exchange will provide a net conservation benefit to the Refuge by "exchanging lower quality habitat for higher quality habitat, increasing the total protected acreage in the Refuge, reducing habitat fragmentation in the long term, and allowing the Refuge to acquire a high-priority tract that would not otherwise be available." App'x 185.

FWS concluded that the exchanged lands where the Project would be built: (1) are already fragmented by an existing road; (2) maintain

little to no wildlife or habitat value; (3) are difficult to maintain; and (4)

comprises primarily reed canary grass (an invasive plant that FWS "has

had limited opportunity and success in treating") and scattered willows

and shrubs. App'x 185–187.[5] In contrast to the hyperbolic assertions of

"clearcutting" made by Plaintiffs in their briefs, FWS found that the

Project would involve only "minor tree clearing" activity along Oak Road,

where relatively few large trees exist and most are less than 15 years old.

App'x 186; App'x 374; *see also* App'x 15 (Federal Defendants' counsel

disputing "clearcutting" characterization).

## C.    Plaintiffs' Prior Litigation Against the Project's Federal Approvals

Plaintiffs and a major conservation organization that is no longer a

party to this action (Defenders of Wildlife) filed suit in 2021 to challenge

FWS' grant of a right-of-way for the Project to cross at Nelson-Dewey.

Plaintiffs asserted claims under NEPA, the Refuge Act, the Clean Water

Act, and the Endangered Species Act. *Nat'l Wildlife Refuge Ass'n v. Rural

Utils. Serv.*, 580 F. Supp. 3d 588, 594-95 (W.D. Wis. 2022), *vacated by*

---

[5] To complete the Project, the Utilities will use wooden construction matting to minimize ground disturbance and will not conduct any grading in the Refuge. App'x 952 ¶ 4; App'x 911–912, 916 ¶¶ 57, 72.

*Driftless Area Land Conservancy v. Rural Utils. Serv.* ("*DALC*"), 74 F.4th 489 (7th Cir. 2023).

Plaintiffs moved for a preliminary injunction on certain of their claims, and the court granted a preliminary injunction against some work *outside* the Refuge based on alleged harms from that work. *Nat'l Wildlife Refuge Ass'n v. Rural Utils. Serv.*, No. 21-cv-096-WMC, 2021 WL 5050073, at *10 (W.D. Wis. Nov. 1, 2021) (enjoining utilities from "any activities requiring permission under the [Corps' Clean Water Act] Utility Regional General Permit until the issuance of an opinion and order on summary judgment."). The court had no occasion to consider harms to the Refuge from work within it. The court found that Plaintiffs were likely to succeed on the merits of their Clean Water Act claims against the Corps' general permits for the Project in Wisconsin—but the court later reversed itself on this issue with the benefit of summary judgment briefing. *Nat'l Wildlife Refuge Ass'n,* 580 F. Supp. 3d at 615, *vacated in part by DALC*, 74 F.4th 489 (Corps permit is "in fact, compliant with the requirements of NEPA"). (This Court ultimately denied Plaintiffs' cross-appeal, based on the district court's failure to

award injunctive relief outside the Refuge, and upheld the district court's decision in that regard.)

The district court entered summary judgment in Plaintiffs' favor on their challenge to FWS' analysis of the (by then) rescinded right-of-way and (then only proposed) land exchange, and their claim that the EIS was "insufficient" because the stated purpose and need was too narrow because it included the purpose of connecting the grid in Iowa to the grid in Wisconsin (i.e., the core purpose for the Project determined by MISO). *DALC*, 580 F. Supp. 3d at 608–11, 613. The Utilities and Federal Defendants appealed the judgment. This Court vacated the decision, holding that Plaintiffs' challenges to the Exchange and the EIS were premature because there was no final agency action. *DALC*, 74 F.4th at 494. The Court remanded the claims, instructed the district court to dismiss them; vacated the judgment; and directed that the case would have "no authoritative or precedential effect in any future suit." *Id*.

The Seventh Circuit issued its decision on July 19, 2023, and the mandate on September 11, 2023. *DALC*, No. 22-1347 (7th Cir.), Dkt. Nos. 122, 124. The district court did not dismiss the case until December 18,

2023—more than 90 days after the mandate issued. [6] Text Order, *Nat'l Wildlife Refuge Ass'n*, No. 21-cv-096-WMC (W.D. Wis. Dec. 18, 2023).

## D. Plaintiffs' Litigation Against The Project's Current Federal Approvals.

Federal Defendants gave the Agreement and other relevant documents to Plaintiffs on the day that they were issued (February 23, 2024). App'x 662 ¶ 90. On March 6, 2024, Plaintiffs filed their complaint (again asserting claims under NEPA and the Refuge Act), attaching 25 exhibits (declarations by individual members and the various NEPA and decision documents challenged in their Complaint), and moved for a temporary restraining order. No. 23-cv-00139 ECF Nos. 1, 2. The district court converted the motion into a preliminary injunction motion on March 8 and gave Plaintiffs additional time to supplement their motion. *Id.*, ECF No. 31. On March 13, Plaintiffs filed a supplemental brief seeking a preliminary injunction. *Id.*, ECF No. 38.

Plaintiffs' preliminary injunction brief advanced three arguments on the merits: (1) that the Exchange violated the Refuge Act because it

---

[6] Under the law of the Circuit, "once the mandate issues, the district court has a plain legal duty to enter a conforming judgment without undue delay." *In re Ezell*, 678 F. App'x 430, 431 (7th Cir. 2017).

was not accompanied by a "Compatibility Determination" (an analysis the Refuge Act requires when an agency grants a right-of-way or other permit to a third-party to use Refuge lands) and was allegedly inconsistent with the Refuge's plan (Refuge Act claim); (2) that the district court "ha[d] already ruled in favor of Plaintiffs on their NEPA claims" challenging the purpose and need for the 2019 EIS (EIS claim); and (3) that Federal Defendants' publication of the SEA, FONSI, and NBA violated NEPA's public participation requirements (SEA claim). Their brief cited the vacated opinion 12 times, and a preliminary injunction in the same case (later superseded by the final opinion) 4 times. No. 23-cv-00139 ECF No. 38.

Federal Defendants and the Utilities filed detailed opposition briefs showing that Plaintiffs had failed to carry their burden on each of the four factors required to obtain a preliminary injunction under *Winter*, 555 U.S. at 24. Both opposition briefs addressed and refuted each of Plaintiffs' arguments on the merits, citing the very documents Plaintiffs presented to the court that reflected the agency's expert analyses supporting the Exchange—the SEA, FWS FONSI, and NBA—in addition to the original EIS for the Project. Federal Defendants also attached the declaration of

Refuge Manager Sabrina Chandler and an exhaustive legal opinion by the Department of the Interior's highest-ranking lawyer explaining the requirements for land exchanges under the Refuge Act (and that those requirements *do not* include a compatibility determination). App'x 666–680. The Utilities attached declarations from four company witnesses, App'x 884, 891, 921, 951; MISO's Director of Resource Utilization, App'x 863; an expert economist quantifying a range of the Project's likely emissions reductions, App'x 935; and the Executive Director of Clean Grid Alliance, an organization that advances renewable energy development and clean energy policy in the Midwest. App'x 872.

The Utilities explained the importance of closing promptly on the Exchange to meet the need for the Project and then impending in-service date. App'x 800–802, 844–852. Both Federal Defendants and the Utilities explained at length why, based on FWS' careful, detailed, and expert analysis in the environmental documents, Plaintiffs had not shown irreparable harm from the Exchange; the balance of equities tilted decidedly against injunctive relief; and allowing the Exchange and Project to move forward was in the public interest.

In addition, American Clean Power Association, Clean Grid Alliance and Edison Electric Institute moved to appear as amicus curiae in support of the Project. App'x 681; App'x 704. Edison Electric Institute argued that the Project was the product of a rational and well-supported regional transmission planning effort by MISO; that Plaintiffs' challenge to the Project's purpose and need (i.e., that FWS may not defer to the planning efforts of a Commission-approved Regional Transmission Operator) would result in making federal agencies with no transmission planning expertise into grid planners; and that the result would have adverse consequences for transmission planning and the clean energy transition. App'x 704. American Clean Power Association and Clean Grid Alliance explained that the need for the Project is more critical today than ever given the accelerating pace of and demand for clean energy technology. App'x 681.

On March 21, 2024, one day before the scheduled preliminary injunction hearing, the court entered the one-sentence Text Order preliminarily enjoining Defendants "from closing on any land exchange involving the [Refuge] before the court issues its decision on the pending motion for preliminary injunction." App'x 1.

During the hearing, Plaintiffs and the court repeatedly discussed the court's vacated summary judgment decision, which the court referred to as "*evidence* of substantial success on the merits." App'x 53 (emphasis added). At the end of the hearing, the court set a schedule for supplemental briefing and said that it would "continue" the injunction at least until Federal Defendants produced the complete administrative record. App'x 71–72.

On March 25, 2024, the court entered the five-page Continuation Order setting a schedule for further briefing on the preliminary injunction motion and "continuing" the March 21 order. App'x 3–7. The Continuation Order stated that "the parties will have 30 days from receipt of the administrative record to file briefs addressing whether that record is sufficient to support the federal defendants' [NBA] and FONSI." App'x 6. It also set deadlines for the parties to file briefs on the question whether the Federal Defendants provided Plaintiffs with adequate notice and opportunity to comment on the land exchange. App'x 7. On the same day, the court issued an order preliminarily enjoining Federal Defendants and the Utilities:

> from taking any action to close the land exchange agreement or begin construction on … [the Project]

> running through and across the [Refuge]… until
> after this court has an opportunity to review and
> consider the relevant administrative record … and
> issued a decision on whether to continue plaintiffs'
> preliminary injunction further.

App'x 8–9. None of the Orders addressed any of the four *Winter* factors or the standard for obtaining a preliminary injunction (i.e., a "strong showing" for each of the prerequisites).

The Utilities appealed the Orders on March 29 (App'x 959) and, on April 1, filed a motion for stay pending appeal and for expedited consideration in the district court under Rule 62(c) advising that they intended to move in this Court for the same relief after April 4. App'x 966, 973. Despite the motion's plea for relief on or before April 4, on April 2, the district court entered an order giving Plaintiffs until April 11 to respond to the motion, and stating (despite the notice of appeal) that the motion "reads more as a motion to reconsider." App'x 1001. The district court never withdrew the deadlines it ordered for supplemental briefing on whether to further "continue" the preliminary injunction, and Plaintiffs filed their supplemental brief on April 8. On April 5, the Utilities moved this Court for a stay pending appeal, and to expedite consideration of that motion and the appeal. Dkt. Nos. 9, 10. The Court

deferred ruling on the motions before it "until the district court has acted (within a reasonable time)." Dkt. No. 18. [7]

On April 18, to comply with the Continuation Order, Federal Defendants and Intervenor-Defendants filed their briefs on the notice and comment issue. No. 23-cv-00139 ECF Nos. 82, 83, 86-1. Intervenor-Defendants prefaced their brief by noting that the district court no longer had jurisdiction over issues related to the preliminary injunction because of the pending appeal. *Id.*, ECF No. 83, at 2–3 (citing *United States v. Ali*, 619 F.3d 713, 722 (7th Cir. 2010)).

## SUMMARY OF ARGUMENT

This Court should reverse and vacate the district court's Orders. App'x 1–9. The court's award of the injunction was an abuse of discretion because the court failed to follow the required procedures or base its decision on the proper considerations for such relief. To the extent the court's rationale can be gleaned from stray remarks during a hearing held after the Text Order issued, the court appears to have relied not on the *Winter* factors, but instead on (1) the fact that Federal Defendants

---

[7] On April 26, the district court denied the Utilities' motion to stay pending appeal. No. 24-cv-0139, ECF No. 88 (Apr. 26, 2024).

had not yet compiled the administrative record, and (2) the district court's vacated prior decision in a different case challenging a different agency action that this Court instructed would have "no authoritative or precedential effect." Neither is a basis for injunctive relief, and both improperly displaced the burden of persuasion from where it rightly lies—with the movant.

The court abused its discretion enjoining the Exchange without stating its reasons or applying the proper factors. The Orders do not comply with Federal Rules of Civil Procedure 52 and 65; improperly presume Plaintiffs were entitled to an injunction; reflect no consideration of the factors a court must balance before awarding the "extraordinary remedy" of an injunction or the required factors under the FAST Act[8] for projects like this one; and improperly rely on a vacated order. The lower court's decision should be reversed.

The failures in the court's process for awarding injunctive relief are more than formalities; by inverting the burden of persuasion, the court effectively presumed that any agency decision is invalid until reviewed

---

[8] Fixing America's Surface Transportation Act of 2015, Pub. L. No. 114-94, 129 Stat 1312 (Dec. 4, 2015).

and affirmed by a court. That fundamentally misconceives the Administrative Procedure Act, which accords a presumption of regularity to decisions by government officials. The court provided no reasoning for granting what the Supreme Court has described as "an extraordinary remedy" that is "never awarded as of right." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010); *Winter*, 555 U.S. at 24.

The defects in the court's decision-making have consequential real-world effects. An evaluation based on the proper criteria would have shown that the injunction will substantially harm Federal Defendants, Intervenor-Defendants (who have, with their co-owner ATC, invested $650 million in the Project) and the public interest. The injunction prevented the Utilities from meeting the scheduled in-service date for this important project, which will increase the transfer of lower-cost, renewable energy from Iowa to Wisconsin and make the grid more reliable. And, until the Utilities are permitted to close on the thoroughly vetted Exchange and complete construction of the Project on a copiously analyzed crossing, the Exchange's benefits to the Refuge will also remain out of reach: approximately 35 acres of high-quality habitat in exchange for approximately 19 acres of lower-quality habitat, where the line would

be placed, and removal of the Utilities' existing lines in the Refuge and their rights to place the new line there, if necessary. App'x 892–893 ¶¶ 5–6; App'x 929 ¶ 19; App'x 952–953 ¶¶ 4–5, 10; App'x 1033–1034. The court's failure to apply the *Winter* factors is all the more remarkable given the costly real-world consequences of its orders.

In addition, the injunction should be vacated while the case is remanded to the district court. Leaving the injunction in place while the court engages in the required analysis would be unacceptable, particularly because the district court may again disregard this Court's instructions, as it did when it declined to adhere to the Court's instructions regarding the earlier, vacated opinion. The Court should reverse the decision and vacate the injunction until the district court issues a decision that complies with the Rules and the law.

## ARGUMENT

### A. Standard of Review

A preliminary injunction is an "extraordinary remedy" that is only appropriate where the party seeking it has made a clear showing that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public

interest. *Winter*, 555 U.S. at 20, 22. If a plaintiff fails to meet any one of the prerequisites for a preliminary injunction, the injunction must be denied. *Cox v. City of Chicago*, 868 F.2d 217, 223 (7th Cir. 1989).

In reviewing the grant of a preliminary injunction on appeal, legal conclusions are reviewed de novo, findings of fact for clear error, and the balancing of harms for abuse of discretion. *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018); *D.U. v. Rhoades*, 825 F.3d 331, 335 (7th Cir. 2016). If a court applies an erroneous view of the law, "by definition" it abuses its discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996). "[A] factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination." *Lawson Prod. Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1437 (7th Cir. 1986). Applying an "incorrect preliminary injunction standard" is also an abuse of discretion that warrants reversal. *Id.*

**B. The District Court Abused Its Discretion by Preliminarily Enjoining an Important Infrastructure Project without Performing Required Analyses or Applying the Correct Standards and Precedent.**

    **1. The district court abused its discretion by failing to comply with Rule 65's requirement to "state the reasons why [the injunction] issued" or Rule 52(a)(2)'s requirement to state the "findings and conclusions" supporting its orders.**

The district court abused its discretion by issuing a Text Order enjoining the Exchange that failed to include the requisite findings of fact and conclusions of law necessary to support the preliminary injunction. Federal Rule of Civil Procedure 65(d)(1)(A) provides that every order granting an injunction must "state the reasons why it issued."[9] *In re Jimmy John's Overtime Litig.*, 877 F.3d 756, 769 (7th Cir. 2017) (district court abused discretion by "failing to consider the traditional factors for granting an injunction and failing to make the requisite findings of fact and conclusions of law"). "Rule 65(d) is no mere extract from a manual of procedural practice. It is a page from the book of liberty." *H. K. Porter Co. v. Nat'l Friction Prod. Corp.*, 568 F.2d 24, 27 (7th Cir. 1977). The Seventh

---

[9] Federal Rule of Civil Procedure 52(a)(2) similarly provides that for an interlocutory injunction "the court must similarly state the findings and conclusions that support its action."

Circuit, reversing an injunction where the judge did not include its reasoning, explained:

> Before issuing an injunction, a judge must identify the appropriate legal standard and make the findings of law and fact required by that standard. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." [*Winter*, 555 U.S. at 20]. The district judge did not discuss these subjects … The district judge was silent about everything that matters.

*Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481, 483 (7th Cir. 2015);

*Denofre v. Transp. Ins. Rating Bureau*, 532 F.2d 43, 45 (7th Cir. 1976) (reversing motion to dismiss where trial court violated Rule 52's requirements to state findings of fact and conclusions of law). The Text Order stated no reasons and failed to comply with the rule.

The two later orders purporting to "continue" the injunction do not cure the illegality of the Text Order because they too did not consider the factors courts must analyze before awarding injunctive relief and relied on a vacated decision with no authoritative or precedential value. Nor do the references in the Continuation Order to the court's prior, vacated decision satisfy the Rules' requirement to state the reasons for the

injunction. *Dupuy v. Samuels*, 465 F.3d 757, 758 (7th Cir. 2006) (Rule 65(d) "requires that an injunction be a self-contained document rather than incorporate by reference materials in other documents."). The Orders fail to comply with the Rules and should be reversed.

> **2.     The district court abused its discretion by presuming Plaintiffs' entitlement to injunctive relief.**

An injunction is an "extraordinary remedy" never granted as a matter of right. *Monsanto*, 561 U.S. at 165–66; *Winter*, 555 U.S. at 24. Here, the Orders reflect that the district court erroneously presumed that Plaintiffs were entitled to injunctive relief:

> [P]*laintiffs at least have a right to challenge the proposed land exchange in court before* the metes and bounds of the Refuge are forever altered and the foundation for a 195-foot powerline tower is planted in the middle of the Mississippi River bottom.

App'x 6 (emphasis added). This reasoning is flawed because "[i]t is not enough for a court considering a request for injunctive relief to ask whether there is a good reason why an injunction should *not* issue; rather, a court must determine that an injunction *should* issue under the traditional four-factor test." *Monsanto Co.*, 561 U.S. at 158. In addition, although Plaintiffs have a right to challenge the proposed land exchange (as they are doing), there is no presumption based merely on the fact that

a Project is litigated that the agency's action is "arbitrary and capricious"; to the contrary, agency action is accorded a presumption of regularity. *United States v. Chemical Found.,* 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

The district court cited no authority for its determination that it was required to grant the preliminary injunction because the complete administrative record had not yet been lodged. App'x 6; *see also* App'x 14, 16, 49. That result conflicts fundamentally with *Winter* and other cases holding that it is a *movant's* burden to demonstrate the necessity for injunctive relief by making an adequate showing on each of the four factors. *See supra* § B.3. The court abused its discretion by concluding that it had to preliminarily enjoin the Exchange because the entire record had not yet been produced.

The court's rationale is particularly inapt because it had before it all key documents relevant to the challenged decisions. The Administrative Procedure Act itself does not compel courts to review the whole administrative record in every case (let alone at the preliminary

injunction stage). 5 U.S.C. § 706 ("the court shall review the whole record *or those parts of it cited by a party*") (emphasis added). Nor is there any Federal Rule of Civil Procedure that governs the timing of its production. Here, the government stated that the court had the key documents in the administrative record for the Exchange decision, which were attached to the Complaint. App'x 747; App'x 16–17. Plaintiffs never identified any additional types or categories of documents the court would need to rule on their motion.

### 3. The district court abused its discretion by failing to balance the factors required under *Winter*.

An injunction is a drastic remedy. The Federal Rules' requirement that a court state the reasons for an injunction ensures that courts determine, before granting such motions, that the requisite showings have been made. To obtain an injunction, a plaintiff must demonstrate "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter,* 555 U.S. at 24*; Monsanto Co.,* 561 U.S. at 165–66. The test applies to all claims, including those based on NEPA. *Monsanto*, 561 U.S. at 156–57.

This Court has instructed that an "applicant [for a preliminary injunction] must make a *strong showing* that she is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)) (emphasis added); *Grubhub Inc. v. Relish Labs LLC,* 80 F.4th 835, 856 n.12 (7th Cir. 2023) ("[A]n applicant for preliminary relief bears a 'significant burden' and must establish more than a mere possibility of success."). And the applicant still must satisfy the other three *Winter* criteria:

> The applicant must also demonstrate that "irreparable injury is likely in the absence of an injunction," … In addition, the balance of equities must "tip[ ] in [the applicant's] favor," and the "injunction [must be] in the public interest."

*Pritzker*, 973 F.3d at 763 (quoting *Winter*, 555 U.S. at 20, 22). A court's failure to consider each of the four factors before granting an injunction is reversible error. *Winter*, 555 U.S. at 23 (even assuming plaintiffs had shown irreparable harm to whales, injunction was abuse of discretion given court's failure to adequately consider public interest in naval training exercises); *Adkins*, 779 F.3d at 483.

None of the Orders mentions or considers any of the four *Winter* factors. None found that Plaintiffs made a *strong showing* that they were

likely to succeed on the merits. Indeed, one statement in the Continuation Order suggests that the court made no finding at all with respect to success on the merits. App'x 5 ("*Whatever the merits of plaintiffs' challenge* to the federal defendants' decision to proceed with the land exchange under the relevant statutes, *some* meaningful review by this court is necessary.") (emphasis in first clause added). The court mentioned the wrong standard. App'x 54 ("some likelihood of success"). And, because the court did not directly address success on the merits in any of the Orders, it is impossible to know what standard it applied. With respect to one of Plaintiffs' claims (i.e., the adequacy of notice and opportunity to comment on FWS' NBA and FONSI), the court ordered supplemental briefing, further demonstrating that Plaintiffs had apparently not, by that point, made a "strong showing" on that claim.

The Orders also referenced prior findings of harm, although they do not specify the source. The court was presumably referring to its November 2021 order awarding preliminary injunctive relief in the prior case against construction *outside* the Refuge. *Nat'l Wildlife Refuge Ass'n*,

2021 WL 5050073.[10] The Orders nowhere address whether Plaintiffs *in this case* will be harmed absent the injunction, let alone irreparably.[11] They do not balance the equities or otherwise consider interim harms to Federal Defendants or the Utilities during an injunction. Despite extensive information about the public interest presented to the court, including affidavits from the Utilities' employees, Clean Grid Alliance's Executive Director, MISO's Director of Resource Utilization, and amici Edison Electric Institute, American Clean Power Association, and Clean Grid Alliance about the benefits of the Project, and ample record evidence

---

[10] That decision, which relied on a Clean Water Act claim that the court later rejected, is likewise not a proper basis for injunctive relief in this case. *Tully v. Okeson*, 78 F.4th 377, 381 (7th Cir. 2023) ("Rulings—predictions—as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case, whether the ruling is made by a trial court or by an appellate court.").

[11] Plaintiffs' claims that they will suffer harms derivative of impacts to the Refuge are directly contradicted by the expert findings of the FWS Refuge Manager, who concluded that the Exchange will provide a net benefit to the Refuge by exchanging lower quality habitat for higher quality habitat; increasing the total protected acreage in the Refuge by nearly double the amount divested, reduce habitat fragmentation; and allowing the Refuge to acquire a high-priority tract that would not otherwise be available. App'x 185–186. These expert assessment of the relative value to wildlife of the exchanged lands deserve deference. *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 859 (7th Cir. 2003) (under arbitrary and capricious review, agency's decision-making "implicates substantial agency expertise and is entitled to deference").

in the FONSI, NBA and declaration of the Refuge Manager, showing the

benefits to the Refuge, the Orders do not discuss public interest. They do

not acknowledge the urgent need to implement the Project, planned by

MISO to achieve reliability, economic, and public policy (i.e., renewable

energy) purposes. Tellingly, MISO is never mentioned.

### 4. The district court abused its discretion by failing to make the findings required under the FAST Act.

Because this Project is a "covered project" under the FAST Act, the

district court was required to consider the public welfare, environmental

and economic harms that would result *from* a preliminary injunction, and

not to presume that they can be reversed.[12] 42 U.S.C. § 4370m-6(b)(1)–

(2). The FAST Act represents an effort to "improve[] our Nation's

infrastructure" by "streamlin[ing] the environmental review and

---

[12] The Project is a "covered project" under the FAST Act, App'x 1010; 42 U.S.C. § 4370m-6(a); *see also* Complaint, No. 23-cv-00139 ECF No. 1, ¶ 30 (asserting the action is timely under the FAST Act). A covered project is "activity in the United States that requires authorization or environmental review by a Federal agency involving construction of infrastructure for renewable or conventional energy production, electricity transmission . . . or any other sector" that meets certain criteria regarding its treatment under NEPA. 42 U.S.C. § 4370m.

permitting process" for important and complicated infrastructure projects through close inter-agency coordination.[13]

Congress also imposed limits on judicial review of FAST Act projects, shortening the statute of limitations to two-years and directing courts to specifically weigh their significant health, safety, environmental, and economic impacts. 42 U.S.C. § 4370m-6(a)(1)(A) and (b)(1). When ruling on a motion to preliminarily enjoin a FAST Act "covered project," courts must:

> (1) consider the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction; and

---

[13] *See* U.S. Senate Comm. on Env't and Public Works, H.R. 22, Joint Explanatory Statement of the Committee of the Conference, Division a Surface Transportation at 1–2, https://www.epw.senate.gov/public/_cache/files/9/8/989e5d98-8847-45cc-b9e0-4510f56d652a/C212CC07CE890FB80E83A45B2C5C858C.joint-explanatory-statement.pdf; *see also* OFF. OF MGMT. & BUDGET, EXEC. OFF. OF THE PRESIDENT, Memorandum for Heads of Federal Departments and Agencies, M-17-14, Guidance to Federal Agencies Regarding the Environmental Review and Authorization Process for Infrastructure Projects, Jan. 13, 2017, https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/memoranda/2017/m-17-14.pdf ("Title 41 of the FAST Act … created a new governance structure, set of procedures, and funding authorities designed to improve the timeliness, predictability, and transparency of the Federal environmental review and authorization process for certain covered infrastructure projects across a broad range of sectors.").

> (2)    not presume that the harms described in
>         paragraph (1) are reparable.

*Id.* § 4370m-6(b). Here, proper consideration of those factors weighs against an injunction, which would delay a Project designed to further clean energy and reliability goals. Yet none of the Orders even mentions their potential effects on "public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction," despite briefing by all Defendants, and declarations submitted by the Utilities that described such harms at length. *See, e.g.*, App'x 779–781; App'x 854–861; App'x 868–871 ¶¶ 11–15; App'x 942–950 ¶¶ 21–35, App'x 875–882 ¶¶ 11, 16, 18–22, App'x 923–930 ¶¶ 6, 10–19. Plaintiffs failed entirely to brief the issue of FAST Act compliance.

### 5.    The district court abused its discretion by relying on vacated findings that this Court instructed would not have "authoritative or precedential" effect in any future suit.

In *DALC*, this Court gave explicit instructions: the case should be dismissed and the prior order should be vacated and "will not have any authoritative or precedential effect in any future suit." 74 F.4th at 496. Nevertheless, the Continuation Order rested in part on findings in the vacated opinion. Indeed, the Continuation Order opens by citing the vacated opinion:

> In that decision, this court held on the merits that
> federal defendants had failed "to meet the legal
> requirements for an Environmental Impact
> Statement, Compatibility Determination, and
> Land Transfer.

App'x 4; *see also* App'x 6 ("[O]ne so-called supplemental EIS … in turn
relies substantially on an underlying environmental impact statement
that this court already found deficient."). The court's reliance on a
decision with no "authoritative or precedential effect" does not satisfy
this Circuit's requirement of a "strong showing" of success on the merits
to justify an injunction. *Pritzker*, 973 F.3d at 763.

By relying on the vacated decision, the court also violated the
mandate rule, which "requires a lower court to adhere to the commands
of a higher court on remand." *United States v. Polland*, 56 F.3d 776, 777
(7th Cir. 1995). "Under the mandate rule, when a court of appeals has
reversed a final judgment and remanded the case, the district court is
required to comply with express or implied rulings of the appellate court."
*In re A.F. Moore & Assocs., Inc.*, 974 F.3d 836, 840 (7th Cir. 2020) (per
curiam) (cleaned up); *see also United States v. Bell*, 5 F.3d 64, 66 (4th Cir.
1993) ("[The mandate rule] compels compliance on remand with the
dictates of a superior court and forecloses relitigation of issues expressly

or impliedly decided by the appellate court."); *see also Nelson v. Welch*, 684 F.3d 684, 687 (7th Cir. 2012) ("It was … clearly improper for the district court to rely on vacated orders."). The court's repeated invocation of prior findings—which predated the Exchange and thus were not based on the unique and robust analyses and documents supporting the Exchange (including the SEA, FONSI, and NBA)—does not adhere to this Court's instructions. The district court abused its discretion, and the Orders should be vacated for that reason.

## CONCLUSION

The Court should reverse and vacate the Orders.


Dated: April 26, 2024            Respectfully submitted,

                                  *s/ Thomas C. Jensen*
                                  Thomas C. Jensen
                                  TJensen@perkinscoie.com
                                  Stacey Bosshardt
                                  SBosshardt@perkinscoie.com
                                  Edward A. Boling
                                  TedBoling@perkinscoie.com
                                  PERKINS COIE LLP
                                  700 13th Street, N.W., Suite 800
                                  Washington, D.C. 20005-3960
                                  Telephone:  202.654.6200
                                  Facsimile:  202.654.6211

                                  *Attorneys for Intervenor-*
                                  *Defendants-Appellants ITC*

*Midwest LLC and Dairyland Power Cooperative*

Lisa M. Agrimonti, Wis. Bar No. 1032645
Haley L. Waller Pitts, Wis. Bar No. 1115291
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Tel: (612) 492-7000
Fax: (612) 492-7077
lagrimonti@fredlaw.com
hwallerpitts@fredlaw.com

*Attorneys for ITC Midwest LLC*

Justin W. Chasco, Wis. Bar No. 1062709
**FREDRIKSON & BYRON, P.A.**
44 East Mifflin Street, Suite 1000
Madison, WI 53703
Phone: (608) 441-3813
jchasco@fredlaw.com

*Attorney for Dairyland Power Cooperative*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and 7th Cir. R. 32(c) because this brief contains 8,705 words, including the glossary and figures and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 7th Cir. R. 32(b) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.


Dated: April 26, 2024

                         *s/ Thomas C. Jensen*
                         Thomas C. Jensen
                         PERKINS COIE LLP

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 26, 2024

*s/ Thomas C. Jensen*
Thomas C. Jensen
PERKINS COIE LLP

No. 24-1492

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

————

National Wildlife Refuge Association, et al.,
*Plaintiff-Appellees,*

v.

ITC Midwest LLC, et al.,
*Intervenor-Defendants-Appellants.*

————

**On Appeal from the United States District Court
for the Western District of Wisconsin,
Case No. 23-cv-00139
The Honorable William M. Conley, Judge**

————

**REQUIRED SHORT APPENDIX OF INTERVENOR-
DEFENDANTS-APPELLANTS ITC MIDWEST LLC AND
DAIRYLAND POWER COOPERATIVE**

**(APP'X 1 TO 76)**

**Perkins Coie LLP**
Thomas Jensen
Stacey Bosshardt
Edward Boling
700 13th Street NW, Suite 800
Washington, DC 20005
(202) 654-6200
TJensen@perkinscoie.com

# RULE 30 CERTIFICATE OF COMPLIANCE

I hereby certify that all of the materials required by 7th Cir. R. 30(a) and 30(b) are included in the Required Short Appendix bound with the Brief of Intervenor-Defendants-Appellants Dairyland Power Cooperative and ITC Midwest LLC and the Intervenor-Defendants-Appellants' Appendix.

      Dated this 26th day of April 2024.

                                    *s/Thomas C. Jensen*

Thomas C. Jensen
PERKINS COIE LLP
700 13th Street NW, Suite 800
Washington DC  20005
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
TJensen@perkinscoie.com

*Counsel of Record for Intervenor-Defendants-Appellants*
*ITC Midwest LLC and Dairyland Power Cooperative*

# INDEX TO APPELLANTS' SHORT REQUIRED APPENDIX

## Case No. 24-0139 District Court Preliminary Injunction Orders

| Description of Document | District Court ECF Docket No. | App'x Page |
|---|---|---|
| **VOLUME 1** | | |
| Text Order, issued March 21, 2024 | ECF No. 60 | 1 |
| Order continuing of Preliminary Injunction, issued March 25, 2024 | ECF No. 62 | 3 |
| Order of Preliminary Injunction, issued March 25, 2024 | ECF No. 63 | 8 |
| Transcript of Motions Hearing held March 22, 2022 | ECF No. 66 | 10 |

**Subject: Activity in Case 3:24-cv-00139-wmc National Wildlife Refuge Association et al v. Rural Utilities Service et al Text Only Order**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Western District of Wisconsin

**Notice of Electronic Filing**

The following transaction was entered on 3/21/2024 at 10:52 AM CDT and filed on 3/21/2024

| | |
|---|---|
| **Case Name:** | National Wildlife Refuge Association et al v. Rural Utilities Service et al |
| **Case Number:** | 3:24-cv-00139-wmc |
| **Filer:** | |
| **Document Number:** | 60(No document attached) |

**Docket Text:**

**\*\* TEXT ONLY ORDER \*\***

**In advance of tomorrow's hearing and consistent with the court's previous discussion with counsel on March 7, 2024, defendants are PRELIMINARILY ENJOINED from closing on any land exchange involving the Upper Mississippi River National Wildlife and Fish Refuge before the court issues its decision on the pending motion for preliminary injunction. Signed by District Judge William M. Conley on 3/21/2024. (jls)**

**3:24-cv-00139-wmc Notice has been electronically mailed to:**

Lisa M. Agrimonti    lagrimonti@fredlaw.com, autodockets@fredlaw.com, rgangl@fredlaw.com

Leslie K. Herje    leslie.herje@usdoj.gov, angelica.santana@usdoj.gov, anne.gassere@usdoj.gov, caseview.ecf@usdoj.gov, jennifer.loy@usdoj.gov

Jeremy Charles Marwell    jmarwell@velaw.com

Stacey Bosshardt    SBosshardt@perkinscoie.com, docketwdc@perkinscoie.com, dpalacios@perkinscoie.com, spais@perkinscoie.com

Howard A. Learner    HLearner@elpc.org, aestrada@elpc.org, cboyce@elpc.org, mdambriunas@elpc.org

Justin William Chasco    jchasco@fredlaw.com

Haley Waller Pitts    hwallerpitts@fredlaw.com, autodockets@fredlaw.com, edaniels@fredlaw.com

Thomas Christian Jensen    tjensen@perkinscoie.com, memerson@perkinscoie.com,

sbosshardt@perkinscoie.com, spais@perkinscoie.com

Edward Andersen Boling    TedBoling@perkinscoie.com

James T. Dawson    jamesdawson@velaw.com

Daniel HB Abrams    dabrams@elpc.org

Kimberly Anne Cullen    kimberly.cullen@usdoj.gov, efile_nrs.enrd@usdoj.gov

U.S. Attorneys_Civil Notices    usawiw-civilecfnotices@usdoj.gov

Reade Wilson    reade.wilson@usdoj.gov, efile_nrs.enrd@usdoj.gov

Gabriel Loew Tabak    gtabak@awea.org

**3:24-cv-00139-wmc Notice will be delivered by other means to::**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATIONAL WILDLIFE REFUGE ASSOCIATION,
DRIFTLESS AREA LAND CONSERVANCY, and
WISCONSIN WILDLIFE FEDERATION,

  Plaintiffs,                                    ORDER

  v.
                                                 24-cv-139-wmc

RURAL UTITLITIES SERVICE; ANDY BERKE,
Administrator, Rural Utilities Service; UNITED STATES
FISH AND WILDLIFE SERVICE; WILL MEEKS,
Midwest Regional Director, and SABRINA CHANDLER,
Manager, Upper Mississippi River National Wildlife and Fish Refuge,
UNITED STATES ARMY CORPS OF ENGINEERS,
LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of
Engineers and Commanding General, U.S. Army Corps of
Engineers, COLONEL JESSE T. CURRY, Commander
And District Engineer, Rock Island District, U.S. Army Corps of
Engineers, and COLONEL ERIC SWENSON, Commander and
District Engineer, St. Paul District, U.S. Army Corps of Engineers,

  Federal Defendants,

  and

DAIRYLAND POWER COOPERATIVE, and
ITC MIDWEST LLC,

  Intervenor-Defendants.

---

A preliminary injunction hearing was held on Friday, March 22, 2024, in the above-captioned matter. Plaintiffs, comprised of various national and state recognized environmental groups, appeared by attorneys Howard Learner, Daniel Abrams, Scott Strand, and Maria Dambruinas. The so-called "federal defendants" appeared by Reade Wilson and Kimberly Cullen. Finally, the intervenor-defendants, Dairyland Power Cooperative and ITC Midwest, LLC, appeared by Stacey Bosshardt and Thomas Jensen.

Although recently filed, this lawsuit has a lengthy history as recounted in *National*

*Wildlife Refuge Ass'n v. Rural Util. Serv,.* 580 F. Supp. 3d 588 (W.D. Wis. 2022).  In that decision, this court held on the merits that federal defendants had failed "to meet the legal requirements for an Environmental Impact Statement, Compatibility Determination, and Land Transfer." *Id.* at 593.  On appeal, however, the Seventh Circuit held that the revocation of defendant United States Fish and Wildlife Services' initial compatibility determination under the Refuge Act, 16 U.S.C. § 668dd(d)(1)(A), prevented this court from reaching the merits, resulting in a remand order to vacate the final judgment and dismiss the case. *Driftless Area Land Conservancy v. Rural Utilities Serv.*, 74 F.4th 489, 496 (7th Cir. 2023).

No one believed that would be the end of the parties' dispute, including the Seventh Circuit.  Rather, that court explained any merits review must await a new, proposed federal action.  Although unknown to either court at the time of their respective ruling, those actions were already underway as U.S. Fish and Wildlife Service and one of the intervenor-defendants, Dairyland Power, had already entered into a non-binding understanding for a land exchange/purchase in a private writing dated October 29, 2021, which detailed the basic terms for the exchange of 19.84 acres of land located within the Refuge (the "Exchange Property") for 35.69 acres of land held by ITC and Dairyland (the "Wagner Property").  (Dkt. #1-36.)

Although the basic terms remained the same throughout, the details of that transaction were then apparently hammered out by the federal defendants and intervenors for the next two years without any public input until the issuance of an over 100 page, draft "Supplemental Environmental Assessment" in September 2023, which quickly became the final SEA after a truncated, 14-day public review and comment period.  (Dkt.

2

#1-21.)  Although plaintiffs were able to meet the small window for comments, the federal agencies went dark again until last month when the federal defendants issued the following documents:

- Agreement for the Exchange of Lands (dkt. #1-18).

- Finding of No Significant Impact on Cardinal-Hickory Creek 345-kV Transmission Line Project Proposal for Route Modification B-IA3 and Land Exchange (dkt. #1-17).

- Land Exchange Net Benefit Analysis (dkt. #1-19).

Unsurprisingly, this prompted plaintiffs to again seek preliminary injunctive relief given that the intervening defendants were planning to proceed with immediate construction of the new transmission lines once the land exchange took effect, which meant as soon as the day after the preliminary injunction hearing, March 22nd, but for this court's temporary restraint of the land exchange.

There are a number of problems with the intervening defendants being allowed to proceed.  Most fundamentally, federal defendants and intervening defendants have orchestrated the events here to preclude judicial review of the final determination until after substantial damage has already been done to what until now was the Refuge. Whatever the merits of plaintiffs' challenge to the federal defendants' decision to proceed with the land exchange under the relevant statutes, *some* meaningful review by this court is necessary to determine "whether that decision is supported by substantial evidence." *Driftless*, 74 F.4th at 494 (citing 5 U.S.C. § 706(2)(F)).  Yet the court does not even have the relevant administrative record prepared to review.

In addition, although federal defendants and intervening defendants apparently take the position that no environmental assessment is even necessary for this specific land exchange, one so-called supplemental EIS upon which both defendants Fish and Wildlife Service and Rural Utilities Service purport to have relied, in turn relies substantially on an underlying environmental impact statement that this court already found deficient.  As was discussed at last Friday's hearing, the Seventh Circuit's opinion vacating that ruling also suggests that perhaps a lower standard should be applied in determining the "suitability" of a land exchange under the National Wildlife Refuge System Improvement Act of 1997, as opposed to the "compatibility" of a designated use.  *Driftless*, 74 F.4th at 494-95.  Whatever the standard, however, plaintiffs at least have a right to challenge the proposed land exchange in court before the metes and bounds of the Refuge are forever altered and the foundation for a 195-foot powerline tower is planted in the middle of the Mississippi River bottom.

For the reasons stated above and during Friday's hearing, therefore, the court will continue to enjoin the land transfer at least until production and review of the relevant administrative record underlying the federal defendants' February 2024 Net Benefits Analysis and FONSI.  The court also established the following briefing schedule as to any continuation of plaintiff's motion for preliminary injunction:

(1) the parties will have 30 days from receipt of the administrative record to file briefs addressing whether that record is sufficient to support the federal defendants' Net Benefits Analysis and FONSI; and

(2) additional briefing as to whether a notice and opportunity to comment period was required following release of the actual February 2024 Net Benefits Analysis,

4

FONSI, or the final, actual Agreement for Exchange of Land, as well as the

underlying administrative record, will proceed as follows:

    (a) plaintiffs may have until April 8, 2024, to file a supplemental brief, and

    (b) intervening defendants have until April 18, 2024, to respond.

Entered this 25th day of March, 2024.

                    BY THE COURT:

                    /s/

                    _____
                    WILLIAM M. CONLEY
                    District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATIONAL WILDLIFE REFUGE ASSOCIATION,
DRIFTLESS AREA LAND CONSERVANCY, and
WISCONSIN WILDLIFE FEDERATION,

                         Plaintiffs,                  PRELIMINARY INJUCTION

    v.

                                                   24-cv-139-wmc

RURAL UTITLITIES SERVICE; ANDY BERKE,
Administrator, Rural Utilities Service; UNITED STATES
FISH AND WILDLIFE SERVICE; WILL MEEKS,
Midwest Regional Director, and SABRINA CHANDLER,
Manager, Upper Mississippi River National Wildlife and Fish Refuge,
UNITED STATES ARMY CORPS OF ENGINEERS,
LIEUTENANT GENERAL SCOTT A. SPELLMON, Chief of
Engineers and Commanding General, U.S. Army Corps of
Engineers, COLONEL JESSE T. CURRY, Commander
And District Engineer, Rock Island District, U.S. Army Corps of
Engineers, and COLONEL ERIC SWENSON, Commander and
District Engineer, St. Paul District, U.S. Army Corps of Engineers,

                         Federal Defendants,

                             and

DAIRYLAND POWER COOPERATIVE, and
ITC MIDWEST LLC,

                        Intervenor-Defendants.

---

      The court issues this separate, written preliminary injunction in keeping with its

Opinion and Order entered today.

      IT IS ORDERED that the federal defendants and intervenor defendants are

PRELIMINARILY ENJOINED from taking any action to close the land exchange

agreement or begin construction on the stretch of the Cardinal-Hickory Creek

Transmission Line Project running through and across the Upper Mississippi River

National Wildlife and Fish Refuge until after this court has an opportunity to review and consider the relevant administrative record underlying the federal defendants' February 2024 administrative decisions and issued a decision on whether to continue plaintiffs' preliminary injunction further.  Those defendants are further directed to expediate the production of that record.

Entered this 25th day of March, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NATIONAL WILDLIFE REFUGE
ASSOCIATION, et al.

      Plaintiffs,                Case No. 24-CV-139-WMC

-vs-

RURAL UTLITIES SERVICE, et al.      Madison, Wisconsin
                              March 22nd, 2024
      Defendants.               9:02 a.m. - 10:40 a.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF MOTION HEARING
HELD BEFORE DISTRICT JUDGE WILLIAM M. CONLEY

APPEARANCES:

For the Plaintiffs:
        Environmental Law & Policy Center
        BY: HOWARD LEARNER,
            DANIEL ABRAMS,
            SCOTT STRAND,
            MARIA DAMBRIUNAS
        35 East Wacker Drive, Ste. 1600
        Chicago, Illinois 60601

Also Present:
        JEFFREY HASKETT, National Wildlife Refuge Association
        JENNIFER FILIPAIK, Driftless Area Land Conservancy
        GEORGE MEYER, Wisconsin Wildlife Federation

For the Defendant:
        DOJ-Enrd
        BY: READE WILSON,
            KIMBERLY CULLEN
        150 M Street NE
        Washington, DC 20002

PHILIP C. HARRELSON, RMR, CRR
United States District Court Reporter
120 North Henry Street
Madison, Wisconsin 53703
\*\*\*

```
 1    Appearances continued:

 2    For Intervenor Defendant: ITC Midwest

 3            Perkins Coie LLP
              BY: STACEY BOSSHARDT,
 4                THOMAS JENSEN,
                  MEGAN MCLEAN,
 5                EDWARD BOLING
              700 Thirteenth Street N.W., Suite 800
 6            Washington, DC 20005

 7                            ***

 8            (Proceedings called to order at 9:02 AM.)

 9            THE CLERK:  The Unites States District Court for the Western

10    District of Wisconsin is now in session.  District Judge William

11    M. Conley presiding.  Please be seated and come to order.

12            Case No. 24-CV-139, National Wildlife Refuge Association et

13    al. versus Rural Utilities Service et al., called for a motion

14    hearing.  May we have the appearances, please.

15            MR. LEARNER:  For plaintiffs, Howard Learner, Daniel Abrams,

16    Scott Strand, and Maria Dambriunas, on behalf of plaintiffs

17    National Wildlife recreation -- National Wildlife Refuge

18    Association, Wisconsin Wildlife Federation, and the Driftless

19    Area Land conservancy.

20            MS. WILSON:  Reade Wilson and my cocounsel Kimberly Cullen

21    from the Department of Justice on behalf of federal defendants.

22            MS. BOSSHARDT:  On behalf of intervenor defendants ITC

23    Midwest and Dairyland Power Cooperative, I'm Stacey Bosshardt.

24    Seated with me at counsel table is my colleague Tom Jensen, and

25    my colleagues Megan McLean and Ted Boling are behind me.
```

1          THE COURT:  Very good.  It's an official -- or an efficient

2     rendition of the players, and I appreciate everyone being

3     prepared on short notice for this hearing.

4          I'm going to start in reverse order with the question of

5     notice and opportunity to be heard, and I think that means that I

6     begin with you, Ms. Wilson.

7          The -- the government isn't taking a position that there

8     isn't an obligation to provide notice and an opportunity to be

9     heard, is it?

10         MS. WILSON:  Your Honor, the regulations require that notice

11    and opportunity to participate to the extent practical.

12    Plaintiffs were afforded an opportunity to participate in this --

13    in providing comments on the draft supplemental environmental

14    assessment that addressed the land exchange.  The land-exchange

15    term sheet was attached to the supplemental EA, and the -- there

16    was a comment period for the public to -- to submit comments.  It

17    was 14 days.

18         THE COURT:  And I just want to be clear.  So that notice was

19    provided on February 23.  So less than a month ago?

20         MS. WILSON:  No, Your Honor.  That --

21         THE COURT:  When was that notice issued?

22         MS. WILSON:  I believe it was in October.  The February 23rd

23    date is when the finding of no significant impact, net benefit

24    analysis, and the land-exchange agreement itself were published.

25         THE COURT:  And who published that?  Who made that decision?

1        MS. WILSON:  Fish and Wildlife Service made the decision.  I

2   believe they were published on the RUS website.  Plaintiffs were

3   provided a copy contemporaneously.

4        THE COURT:  So that's what happened on February 23rd, 2024?

5        MS. WILSON:  Yes, Your Honor.

6        THE COURT:  All right.  Before February 23rd, 2024, what had

7   been disclosed was a statement of proposal for the land exchange

8   in October of last year; is that correct?

9        MS. WILSON:  I believe it was September 8th of 2023 was when

10  the draft supplemental EA was released for public comment.

11       THE COURT:  And what record did Fish and Wildlife rely upon

12  in -- before issuing its February 23rd rendition of the actual

13  land exchange -- the finding of no significant environmental

14  impact and no benefit analysis?  What record did it create for

15  that purpose?

16       MS. WILSON:  Are you referring to the administrative record

17  in support --

18       THE COURT:  Yes.

19       MS. WILSON:  -- of the decision?  Presuma- -- the

20  administrative record, which is compiled after a decision is

21  made.  Prior to the decision, the agency can't compile an

22  administrative record, because the document's considered

23  indirectly or directly in reaching that decision.

24       THE COURT:  All right.  And the administrative record --

25  where -- where does it stand now?  Because the last time I spoke

1    with the parties on the phone, I emphasized the importance of

2    that being expedited.

3        MS. WILSON:  It is being expedited right now.  The agencies

4    are working to gather documents, put them in a format that can be

5    uploaded and lodged with the Court such that the metadata is

6    preserved and everything is in electronic format.

7        THE COURT:  And when will I have that?

8        MS. WILSON:  My -- my last estimate was a few weeks from now

9    still.  It is a bit of a process to get the formatting correct.

10       THE COURT:  All right.  It seems as though -- whether the

11   standard is the same as last time or not -- and Judge Easterbrook

12   has left a number of -- in keeping with the season -- Easter eggs

13   for the Court to unfold, but one of those is that rather than

14   compatibility, I should focus on suitability.  I'm not sure why

15   that is substantially different, but apparently it is -- at least

16   Judge Easterbrook seemed to think it was.  How can I make that

17   determination without the administrative record to review?

18       MS. WILSON:  Your Honor, the administrative record is

19   necessary for the merits determination.  But at this stage, we're

20   at the preliminary injunction, and the standard is different.

21   The plaintiffs have to make a strong showing that they are

22   likely --

23       THE COURT:  Right.

24       MS. WILSON:  -- to proceed --

25       THE COURT:  And I've --

1        MS. WILSON:  -- on the merits.

2        THE COURT:  -- read the parties' briefs, and I appreciate

3    that you're emphasizing some arguable change in how the Seventh

4    Circuit articulates the test, but it's still a balancing test.

5    It still is the level of harm against the likelihood of success

6    on the merits, and I've already found substantial harm by

7    stripping out part of the refuge.

8        I know that -- your position is, and I certainly respect it,

9    but this is a wonderful exchange.  This is the best thing that

10    could happen for the refuge other than the fact that there are

11    going to be power lines.  Higher power lines -- although, not

12    200-foot, but 75-foot -- power lines going through the refuge.

13        But don't you agree that I'm required to review the

14    administrative record?  And what I have so far is an

15    administrative record that suggests you're ripping out part of

16    the refuge.

17        MS. WILSON:  I think that's incorrect, Your Honor.  This --

18    the nature of the exchange property is not such that this is

19    clearcutting.

20        THE COURT:  How do I know that?

21        MS. WILSON:  I believe intervenors attached photographs to

22    one of their --

23        THE COURT:  But that's not --

24        MS. WILSON:  -- declarations.

25        THE COURT:  That's not sufficient -- a few photographs are

1    not going to tell me -- let me say it a different way.  I have an

2    obligation to review what your agencies did, and I don't even

3    have an administrative record of what they considered.

4         MS. WILSON:  You do have --

5         THE COURT:  What I do have is ample evidence that this is

6    a -- this is removing the part of a refuge that congress felt

7    should not be changed.

8         MS. WILSON:  Congress provided that the agency can engage in

9    land exchanges for the benefit of the refuge, and that is exactly

10   what has happened here.  Fish and Wildlife has agreed to

11   exchange --

12        THE COURT:  And with respect, I'm not asking you whether

13   that's true.  I'm asking you how do I decide that without an

14   administrative record to review?  I don't -- since October of

15   last year, there was a proposal.  But apparently, the -- and I

16   guess it's Fish and Wildlife -- did an examination of the

17   environmental impact; right?  They did a FONSI determination.

18        MS. WILSON:  The FONSI was released in February, yes.

19        THE COURT:  When you say "in February" -- it was released

20   less than a month ago.

21        MS. WILSON:  Correct.

22        THE COURT:  And I'm to assume that there's a substantial

23   record that supports that finding, but I don't have the record;

24   right?

25        MS. WILSON:  Your Honor, you have the key documents that

1    support that finding.

2        THE COURT:  How do I know that?  I don't know that.

3        MS. WILSON:  You have the decision documents.  You have the

4    net benefit analysis that supports the agencies' determination

5    that this exchange is in the benefit of the refuge in the United

6    States.

7        THE COURT:  So what opportunity has those who oppose this

8    change had to comment on the FONSI?

9        MS. WILSON:  FONSIs are not subject to public comment.

10        THE COURT:  And the same is true for the benefit analysis?

11        MS. WILSON:  Yes, Your Honor.

12        THE COURT:  Is it true that the actual land-exchange

13    agreement was signed in October of '21?

14        MS. WILSON:  No, Your Honor.  The land-exchanged agreement

15    was signed in February on the 23rd.

16        THE COURT:  So what is -- plaintiffs talk about it -- the

17    statement of proposal -- when was that signed?  Is that signed on

18    October 21?

19        MS. WILSON:  I believe it -- yes, October 21.  And that's

20    the term sheet so that the parties are in agreement on what

21    parcels will be exchanged and under what conditions.  It's

22    necessary to then engage in the environmental review to determine

23    whether -- what the impacts will be.

24        THE COURT:  And why wasn't that disclosed until two years

25    later?

 1          MS. WILSON:  It's still a proposal at that point.

 2          THE COURT:  Yeah, but it would have been -- it would have

 3     been an opportunity for plaintiffs, as well as others, to review

 4     and comment on it since, as you say, that started the process of

 5     looking at the environmental impacts.

 6          MS. WILSON:  And the government produced that term sheet

 7     with the supplemental environmental assessment that analyzed --

 8          THE COURT:  Less than a month -- less than a month ago.

 9          MS. WILSON:  No, the supplemental -- the draft supplemental

10     EA was produced in September of 2023.

11          THE COURT:  So two years after the parties had arrived at a

12     statement of proposal?

13          MS. WILSON:  Correct.

14          THE COURT:  Okay.

15          MS. WILSON:  And during that time, the --

16          THE COURT:  And what was produced along with the actual

17     agreement as to the environmental impacts in September of last

18     year?

19          MS. WILSON:  That's not the actual agreement.  That's the

20     term -- the term sheet you're referring to?

21          THE COURT:  Well, what was disclosed in September of last

22     year?

23          MS. WILSON:  In September of last year was the draft

24     supplemental environmental assessment looking at the -- and

25     analyzing the -- any impacts related to the land exchange, and

1    the term sheet was attached to that draft EA -- supplemental EA

2    in the appendix, and it --

3        THE COURT:  That's the term sheet that had existed for two

4    years?  Or was it changed?

5        MS. WILSON:  That is the same term sheet necessary for the

6    parties to have an -- an understanding of what environmental

7    impacts they're even considering because the term sheet defines

8    the nature of the exchange.

9        THE COURT:  So who prepared the draft supplemental

10   environmental impact?

11       MS. WILSON:  The draft supplemental EA?  That would be RUS

12   as the lead agency for NEPA.

13       THE COURT:  And what was the comment period?

14       MS. WILSON:  So there was 14 days for the draft supplemental

15   EA.  And prior to that, there was an EA that was 30 days.  And

16   the EA looked at route modifications.

17       THE COURT:  So what was the comment period?

18       MS. WILSON:  For the supplemental EA -- draft supplemental

19   EA, it was 14 days.  As stated in our brief, there is no comment

20   period required for a supplemental EA.

21       THE COURT:  Is the government in agreement that there is an

22   obligation for an environmental assessment with a land exchange?

23       MS. WILSON:  So Fish and Wildlife has a categorical

24   exclusion for land exchanges.  What this process would look like

25   if it were just Fish and Wildlife and --

1       THE COURT:  But it's not, obviously, because the Refuge Act

2   is involved.  So my question is -- for your clients, is there an

3   agreement that an environmental assessment was necessary before

4   the land exchange could proceed?

5       MS. WILSON:  The government engaged in an environmental

6   assessment to determine --

7       THE COURT:  I'm not asking you that.

8       MS. WILSON:  To determine --

9       THE COURT:  And the Department of Justice is here

10  representing the defendants, the governmental federal defendants.

11  Is it your position, or do you dispute, that an environmental

12  assessment was necessary to proceed with the land exchange?

13      MS. WILSON:  The agency determines how to comply with NEPA,

14  and my -- my point is just that the EA was done to determine

15  whether changed circumstances required a supplemental EI- -- EIS

16  or just an EA, which is what happened.

17      THE COURT:  And a determination was made that it needed a

18  supplemental EA?

19      MS. WILSON:  Correct.

20      THE COURT:  So you're -- you're in agreement that that was

21  necessary?

22      MS. WILSON:  Yes.  I -- are you referring to the part in the

23  brief where we discuss categorical exclusions?

24      THE COURT:  I'm just talking about whether the Refuge Act

25  required --

```
1              MS. WILSON:  The refuge --
2              THE COURT:  -- some step.
3              MS. WILSON:  The Refuge Act did not require any -- a
4      supplemental EA.  That's under NEPA.  The refugee act -- the
5      Refuge Act does not have a --
6              THE COURT:  Fair -- fair enough.  So are you in agreement
7      that NEPA required a supplemental EA?
8              MS. WILSON:  That is what happened here.  I --
9              THE COURT:  You don't take a position as to whether any of
10     that was required?
11             MS. WILSON:  The agents --
12             THE COURT:  So the government's position is that despite
13     completely protected refuge by congress -- that there could be a
14     land exchange without any environmental assessment?
15             MS. WILSON:  So a land exchange under Fish and Wildlife's
16     NEPA procedures can occur by a categorical exclusion whether the
17     agency uses that way of complying with NEPA or does a more
18     fulsome analysis with an EA depends on the nature of the
19     exchange.
20             THE COURT:  Was it required here, given the nature of this
21     exchange?
22             MS. WILSON:  An EA was completed because of the history of
23     this project and that RUS was the lead on NEPA compliance.
24             THE COURT:  I know what happened.  I'm asking you legally
25     does the government have any position as to whether land
```

1    exchanges -- I mean, the criticism by the plaintiff is that this
2    is just a complete end-around of the protected area, and that if
3    this is allowed to go forward, this categorical exclusion, as you
4    yourself call it, will render meaningless the protections
5    afforded to the refuge because the government can -- can just go
6    ahead and -- and engage in a land exchange without any
7    environmental assessment.
8        MS. WILSON:  I think I -- I misunderstood your question.  A
9    categorical exclusion has not been applied here.  That is the
10   typical path --
11       THE COURT:  No, no.  You didn't misunderstand my question.
12   You just don't want to answer the question.  Is an environmental
13   assessment necessary to approve a land exchange in a protected
14   refuge?
15       MS. WILSON:  And the answer has to be "no" on a general
16   basis because there is a categorical exclusion available for land
17   exchanges.
18       THE COURT:  And I know that didn't happen here, but that
19   seems to be the position of the government, and it seems
20   extraordinary to me that given the protections assigned to
21   refuges, the special environmental respect with which congress
22   has placed them -- that you -- that an end-around can be
23   accomplished by a simple land exchange without an environmental
24   assessment.
25       MS. WILSON:  So a net benefit analysis would still occur to

```
1       support a land exchange.

2            THE COURT:  But -- but no environmental impact?  At least --

3       at least in your view -- and that's fine -- I just want to make

4       sure I understand -- an environmental assessment isn't necessary;

5       although, a supplemental one was done in this case?

6            MS. WILSON:  And whether it -- what NEPA would look like if

7       the Court remanded this to Fish and Wildlife is unclear, and

8       that's -- that's my -- my point.  I --

9            THE COURT:  In other words --

10           MS. WILSON:  The agency would --

11           THE COURT:  -- what else would --

12           MS. WILSON:  -- decide how --

13           THE COURT:  -- what else would need to be done.

14           MS. WILSON:  I'm sorry?

15           THE COURT:  What else would need to be done is unclear,

16      you're saying, under NEPA.

17           MS. WILSON:  The agency --

18           THE COURT:  Beyond what has already been done.

19           MS. WILSON:  The agency would -- has to decide how to comply

20      with NEPA.  So --

21           THE COURT:  Yeah, I -- I think we're just talking by each

22      other now, but I understand the nuance that you're trying to

23      draw.  The fact is, though, that the government's position is

24      that no EA is required in a land exchange.

25           MS. WILSON:  Correct.
```

 1        THE COURT:  And that all that's necessary is a benefits

 2    analysis.

 3        MS. WILSON:  Correct.  But a net benefit analysis is still

 4    required regardless.

 5        THE COURT:  Before I hear from plaintiffs, I want to give

 6    intervenors a chance to clarify any part of that exchange that

 7    you think is important for the Court to understand, again, with

 8    respect to notice and opportunity to comment.

 9        MS. BOSSHARDT:  Thank you, Your Honor.  So the notice and

10    opportunity argument that plaintiffs have made pertains to NEPA.

11    The M-Opinion says that NEPA must be done for land exchanges.  It

12    does not say what level --

13        THE COURT:  What -- and what do --

14        MS. BOSSHARDT:  -- of NEPA is required.

15        THE COURT:  And what do you mean by "NEPA must be done"?

16        MS. BOSSHARDT:  Well, it -- as government counsel was

17    saying, the level of NEPA that needs to be done depends on the

18    nature of the exchange, and the M-Opinion notes that in some

19    case -- in many cases, it can be a categorical exclusion.

20    Separately, the Refuge Act requires --

21        THE COURT:  Which would mean -- and so we're clear -- would

22    that mean no notice or opportunity to comment?

23        MS. BOSSHARDT:  Well, in this case, there was notice and

24    opportunity --

25        THE COURT:  I didn't ask you that.  Would that mean if a

1    categorical exclusion was applied, which was not done here, that

2    there would be no need for a notice of opportunity to be heard?

3        MS. BOSSHARDT:  Unless there were extraordinary

4    circumstances, the categorical exclusion means that the effects

5    are so cumulatively insignificant that -- that those ordinary

6    procedures -- those -- those procedures attendant to an EA are

7    not required.

8        THE COURT:  But even if they are required, the only

9    requirement is a net benefit analysis?

10       MS. BOSSHARDT:  Under the Refuge Act, the net benefit

11   analysis is required.  Under NEPA, it depends.  But importantly,

12   an SEA was done here.  The plaintiffs submitted 12 pages of

13   comments on the land exchange.  They had notice in September of

14   last year.  They submitted comments on it.  They understood the

15   details.

16       THE COURT:  Understood.  And I've read your brief as well,

17   and I understand both arguments.  But your position is also that

18   a supplemental EA, and certainly a -- a full EA was not necessary

19   for a land exchange?

20       MS. BOSSHARDT:  Well, no.  I'm saying in general, is an EA

21   required?  Not always.  Here, an EA was done.

22       THE COURT:  I didn't ask you whether it was done.  I know it

23   was done.  I'm still trying to figure out the legal position of

24   the intervenors.  Are they -- are you in agreement that, on the

25   facts here --

1              MS. BOSSHARDT:  Yes.

2              THE COURT:  -- a supplemental EA was necessary?

3              MS. BOSSHARDT:  I defer to -- I do not think that it has

4      been shown that the way the Fish and Wildlife Service and RUS

5      proceeded here was arbitrary and capricious, which is what

6      plaintiff --

7              THE COURT:  I didn't ask you that question either.

8              MS. BOSSHARDT:  Yes.

9              THE COURT:  And if you don't want to take a position, that's

10     fine.

11             MS. BOSSHARDT:  Sure.

12             THE COURT:  Do you want to defer to the government, which

13     seems to say they're not necessary; just a net benefit analysis

14     is necessary, that's fine too.

15             Anything else you want to add or clarify?

16             MS. BOSSHARDT:  I assume you'll come back to us.

17             THE COURT:  No, this is your last chance to speak today.

18     No.  All we're talking about now is the notice and opportunity to

19     be --

20             MS. BOSSHARDT:  Yeah.

21             THE COURT:  -- to be heard.

22             MS. BOSSHARDT:  Yeah.

23             THE COURT:  All right.  Then let me turn to plaintiffs and

24     begin with the position that your clients have known since

25     September of last year that a supplemental EA was done.  You had

1    the draft, and you had an opportunity to comment on that.  Why

2    doesn't that satisfy the notice and opportunity to comment under

3    NEPA?

4        MR. LEARNER:  Because, Your Honor, there are two different

5    times here.  There are the documents that were released in

6    September of -- and October of 2023, and we were given a 14-day

7    comment period on those.

8        THE COURT:  Understood.

9        MR. LEARNER:  There are the decisional documents released in

10    February of 2024.  There were no drafts released to those.  No

11    opportunity to comment.  Nothing that we were able to do; nothing

12    we were able to say with --

13        THE COURT:  And --

14        MR. LEARNER:  -- regard to the --

15        THE COURT:  -- and they're not --

16        MR. LEARNER:  -- net benefits analysis --

17        THE COURT:  And according to the federal government, there

18    is no requirement under NEPA or the Refuge Act for notice or

19    comment with respect to the final decisions.  That's what your

20    movement to the Court is for.

21        MR. LEARNER:  Your Honor, first of all, that's a different

22    position than is reflected in the FONSI.  I'll direct the Court's

23    attention to Document 1-17, page 2, paragraph 5.

24        Here's what the Fish and Wildlife Service says in that

25    document:  Together, the decision whether to approve the proposed

1    route modifications and the associated administrative action

2    necessary to facilitate the CHC project to cross the refuge is a

3    major federal action requiring compliance with NEPA.  That's --

4    the document at the top says "page 3."  It's actually --

5        THE COURT:  And now you're talking about the FONSI that was

6    issued last month?

7        MR. LEARNER:  That's correct.  It's a major -- federal

8    defendant says, "Crossing the refuge is a major federal -- and

9    the associated administrative action necessary to facilitate the

10   CHC project is a major federal action requiring compliance with

11   NEPA."

12       THE COURT:  All right.  And I -- I get that.

13       MR. LEARNER:  Okay.

14       THE COURT:  But it doesn't tell me whether there is a notice

15   and opportunity to be heard after issuance of the final decision.

16       MR. LEARNER:  Your Honor, first of all, there was no draft.

17   So, of course, we didn't have an opportunity to comment on a

18   draft.  There was a final document.

19       THE COURT:  Well, the -- I'm sorry.  The --

20       MR. LEARNER:  Yeah.

21       THE COURT:  They're saying that the draft was essentially

22   the supplemental EA.

23       MR. LEARNER:  Your Honor, two different time periods, and I

24   thought that federal defendants' counsel may have inadvertently

25   misspoken at one point.  The October 2023 documents were from the

```
 1   rural --
 2        THE COURT:  They say September 2023.
 3        MR. LEARNER:  September and October --
 4        THE COURT:  Well, which is it?
 5        MR. LEARNER:  There is a September document, and then there
 6   was actually an October document.
 7        THE COURT:  Was there a draft supplemental EA issued in
 8   September?
 9        MR. LEARNER:  Yes, there was.
10        THE COURT:  Okay.  So --
11        MR. LEARNER:  We commented on that.
12        THE COURT:  Right.
13        MR. LEARNER:  That was from the Rural Utility Service.
14        THE COURT:  Right.
15        MR. LEARNER:  There was a different -- and it had some
16   updates -- some different information, some of which was
17   overlapping -- issued by the Fish and Wildlife Service
18   February 23 of this year.  There was no --
19        THE COURT:  That was not the FONSI?
20        MR. LEARNER:  That was the final FONSI, a different
21   document.  It was different than the draft that was done by RUS.
22        In that document, I just quoted the provision by which they
23   said "major federal action, triggering NEPA."  And you have the
24   arguments at page 40 of our brief, Your Honor, why the CEQ
25   regulations under NEPA require notice and public opportunity to
```

1    be heard.

2        There was no draft on that.  It went straight to final.

3    There was no opportunity to comment by the public.  The first

4    time we saw that document -- the net benefits analysis -- no

5    draft.  First time we saw the somewhat different FONSI issued by

6    Fish and Wildlife on February 23rd were final documents.  No

7    opportunity to comment.

8        Now, with regard to the FONSI, I'll acknowledge there was

9    overlap.  There was -- there were some things in the

10   February 23rd document that referred to things that the Fish and

11   Wildlife Service did in January and so forth that could not have

12   been in a document that was in September or October.

13       So major federal action.  That's what it says -- Document

14   1-17, page 2, paragraph 5 -- that the associated administrative

15   actions crossing the refuge, major federal action requiring

16   compliance with NEPA.  That includes NEPA both in terms of the

17   notice and public comment.  We address that in our brief at page

18   40 in the CEQ regulations --

19       THE COURT:  Let me just --

20       MR. LEARNER:  -- that do apply.

21       THE COURT:  So I make sure I stay with you.

22       MR. LEARNER:  Yes, sir.

23       THE COURT:  The NEPA requirement that you're relying on

24   would be to have a full environmental impact statement?

25       MR. LEARNER:  Your Honor, in these circumstances --

1          THE COURT:  That's not what I asked.

2          MR. LEARNER:  Well --

3          THE COURT:  But your interpretation of -- if we assume -- if

4     the Court finds this is a major federal action, then doesn't that

5     mean there had to be a full environmental impact statement?

6          MR. LEARNER:  There has to be a lawful full environmental

7     impact statements.  In other words, Your Honor, to be precise --

8     I understand your question; I want to make sure my answer is

9     fully responsive -- this Court has found that the 2019 final

10    environmental impact statement and the 2020 record or decision

11    signed by all three agencies violated NEPA.

12          In the fall of 2023 and in the February 23, 2024, documents,

13    the defendants get around doing it fully IS by saying "we're

14    relying upon the former one."  I think the word they use is

15    "incorporation."  So what they are doing is relying upon --

16          THE COURT:  Well, even that wasn't -- they're really not

17    relying on an environmental impact statement.  They concede

18    they're relying on an environmental assessment.

19          MR. LEARNER:  Correct.  There has to be -- in a major

20    federal action here, as it's stated at page 2 of Document 1-17 --

21          THE COURT:  I've got that down.  You don't --

22          MR. LEARNER:  Yep.

23          THE COURT:  -- need to keep repeating it.

24          MR. LEARNER:  Got it, Your Honor.

25          THE COURT:  Yep.  Go ahead.

1          MR. LEARNER:  Yes, there needs to be a legally compliant

2     environmental impact statement.  They can't have it both ways.

3          THE COURT:  Let me -- let me come back to you, Ms. Wilson.

4     Would you agree that there was not a full environmental impact

5     statement prepared with respect to the land exchange here?

6          MS. WILSON:  No, Your Honor.  And I think it would be

7     helpful to --

8          THE COURT:  No, you would not agree that happened?

9          MS. WILSON:  A full -- a full environmental review under

10    NEPA was completed.  The --

11         THE COURT:  Which I found to be inadequate.

12         MS. WILSON:  Your Honor, I -- my understanding of your prior

13    decision is you found the "purpose and needs" statement to be

14    insufficient, and I -- and the government's position is that is

15    almost irrelevant in this -- at this point because the

16    "purpose and need- --"

17         THE COURT:  I'll try not to be offended.

18         MS. WILSON:  The "purpose and needs" statement is designed

19    to make sure adequate alternatives are considered.  Here, the

20    Fish and Wildlife Service was presented with a land-exchange

21    proposal, and it considered the only alternatives available to

22    it.  It could --

23         THE COURT:  But it didn't do a full environmental impact

24    statement.  It did, at this point, a supplemental environmental

25    assessment.

1          MS. WILSON:  For the changed circumstances of a land

2     exchange as opposed to the right of way that was considered in

3     the original EIS.  But to be clear, plaintiffs are referring to a

4     major federal action which is what triggers NEPA.  NEPA was done

5     here.  The provision in the FONSI that plaintiffs' counsel is

6     referred -- referring to does not require an EIS.  An EIS is

7     required if the impacts are significant.

8          The federal agencies engaged in a --

9          THE COURT:  I'm just absorbing what you said, and I

10    appreciate the nuance.  It's one that Judge Easterbrook also

11    appreciated.

12         Were any federal funds used to finance the land exchange?

13         MS. WILSON:  I'm not sure I understand your question, Your

14    Honor.  Are you talking about an equalizing payment?

15         THE COURT:  Yes.

16         MS. WILSON:  No, there was not an equalizing payment.

17         THE COURT:  But you're not disputing that this was a major

18    federal action?

19         MS. WILSON:  No, Your Honor.

20         THE COURT:  So the only question as to the necessity of a

21    full environmental impact statement is whether the exchange

22    significantly affected the quality of the human environment?

23         MS. WILSON:  It comes down to an issue of significance, yes.

24    And Fish and Wildlife issued a finding of no significant.

25         THE COURT:  All right.  Let me go back to you, Mr. Learner.

1    Assuming that we take the agency at its word that this was a

2    major federal action, NEPA does require a significant effect to

3    the quality of the human environment, and the position, whether

4    or not notice and opportunity to comment was adequate, is that

5    the land exchange is a wonderful opportunity to give up lousy

6    land for much more environmentally significant land, which would

7    seem to suggest it doesn't significantly affect the quality of

8    the refuge.  I know in your materials -- and certainly as a

9    general matter, I found that the integrity of the refuge itself

10   is a substantial interest of the public, but why couldn't a

11   federal agency conclude that this particular land exchange would

12   not significantly affect the quality of the refuge and,

13   therefore, does not require more than the supplemental EA that

14   was done under NEPA?

15        MR. LEARNER:  Your Honor, this is another variation of the

16   shell game that's been played.

17        THE COURT:  I'm aware that --

18        MR. LEARNER:  As a --

19        THE COURT:  The pejoratives aren't necessary.  Just tell me

20   why that shouldn't be possible.

21        MR. LEARNER:  A huge power line going through --

22   high-voltage power line going through a natural wildlife refuge

23   had significant impacts, and that was found --

24        THE COURT:  Understood.

25        MR. LEARNER:  -- in the 2019 final environmental impact

```
 1        statement.  It has been acknowledged, we explain in our brief,
 2        all the impacts on habitat.  In this particular area, on the
 3        adjacent areas --
 4             THE COURT:  Does it matter that it's a 75-foot tower now
 5        than a -- the 200-foot that you --
 6             MR. LEARNER:  Well, Your Honor --
 7             THE COURT:  -- wrote about originally?
 8             MR. LEARNER:  -- in a footnote in one of the briefs, it
 9        refers to one of the towers as 198 feet.  Some of them are
10        smaller.  There's been sort of a moving target here.  Okay?
11             THE COURT:  Which is -- goes back to this question of
12        adequate notice and opportunity, but I understand.
13             MR. LEARNER:  Correct.  Footnote -- I believe it's in the
14        transmission company's brief -- says there's at least one
15        198-foot tower.  Let's say, rounding that to 200 is not
16        inappropriate.
17             This is an area -- the specific quarter that Fish and
18        Wildlife Service has been actively managing along the Turkey
19        River bottom.  These are floodplains.  Fish and Wildlife has
20        conducting a forest-restoration project in this precise area, and
21        that's in our brief, record of decision 005473.
22             The refuge's comprehensive conservation plan highlights the
23        importance of preserving floodplains like this.  That's in the
24        comprehensive conservation plan at page 121.
25             Comprehensive conservation plan and all sorts of other
```

1    documents, the Fish and Wildlife Service make the point of

2    promoting habitat connectivity and avoiding fragmentation,

3    putting a 260-foot-wide new transmission line quarter through the

4    middle of the refuge -- that's almost a football-field width --

5    on its face fragments habitat, and that's been recognized

6    previously by Fish and Wildlife.

7         Fish and Wildlife has also recognized the importance of

8    scenic viewsheds.  This has all been recognized in terms of

9    significant impacts in the invalidated 2019 final environmental

10   impact statement, the comprehensive conservation plan, and the

11   fact that Fish and Wildlife Service has been actively managing

12   this land in a restoration project.  And what they have said

13   elsewhere is it will take 30 to 50 years to revegetate it if it's

14   disturbed.  So for this particular area --

15        THE COURT:  And when you say "this," now you're talking

16   about the exchange property?

17        MR. LEARNER:  No, that was with respect to another

18   property -- the low-power transmission line.  But the --

19        THE COURT:  But that's the one that is going to be restored;

20   correct?

21        MR. LEARNER:  Correct.  30 to 50 years.  With regard to this

22   quarter, the so-called Nelson Dewey, they -- Fish and Wildlife --

23   is working.  They are actively managing the land in the Turkey

24   River bottoms.  This particular quarter where the transmission

25   line is proposed to go with a 260-foot right of way -- they are

1    managing it, conducting a forest-restoration project intended to

2    create a bottom-land forest, and preserve the floodplain and the

3    wetlands.  And that's all in the record.

4         THE COURT:  Well --

5         MR. LEARNER:  So that's with regard to --

6         THE COURT:  And I'm just trying to understand, while that

7    may be in the record, the conclusion by that same entity -- Fish

8    and Wildlife -- was that it was appropriate to exchange away that

9    opportunity for better land.

10        MR. LEARNER:  Fish and Wildlife made a decision, but that's

11   not a discretionary decision by Fish and Wildlife.  Congress made

12   a --

13        THE COURT:  But you're quoting me Fish and Wildlife as to

14   why this is a significant action, but now you're telling me that

15   I can't consider Fish and Wildlife's alternative decision that

16   it's appropriate to exchange this land, notwithstanding the

17   possible opportunities it presents for the floodplain.

18        MR. LEARNER:  Okay.  Your Honor, let me break it into two

19   pieces in response to your question.

20        THE COURT:  I think you did just break it into two pieces.

21   That's my point.

22        MR. LEARNER:  The first was "is it significant?"  And I

23   tried to answer your question to the significant.  The second

24   question that you asked is "Does Fish and Wildlife have the

25   discretion to decide that they think they're getting a good deal

1    so they want to do a swap?"  And on that, that's not compliant

2    with the statute.

3         The 1997 Refuge Act, as you recognized in your earlier

4    opinion, was designed to bring an end to the "lets make a deal"

5    because refuges were dying a death of a thousand cuts as refuge

6    managers were saying, "Well, maybe we'll swap this and exchange

7    that," so forth.

8         So congress, which is the decision maker, put on guardrails

9    here.  What congress said specifically is the secretary of Fish

10   and Wildlife may not initiate or permit a new use of a refuge

11   unless it's determined to be compatible.  And then congress got

12   even more specific than that.  What congress said -- and, Your

13   Honor, if we can just put it up on the screen here -- congress

14   said specifically when it comes to power lines, pipelines,

15   telephone lines, there has to be a compatibility determination.

16   So this is not a matter did Fish and Wildlife --

17        THE COURT:  And while I generally agreed with you, Judge

18   Easterbrook seems to suggest that that's not the ultimate test

19   for exchanges, but rather suitability is what's now required

20   under the statute.

21        MR. LEARNER:  Your Honor, I don't think you can take the

22   Seventh Circuit's decision that far.  First of all -- first of

23   all --

24        THE COURT:  You have that luxury.  I don't.

25        MR. LEARNER:  I understand that, Your Honor.

```
 1          THE COURT:  They're my bosses.

 2          MR. LEARNER:  Your Honor, I understand that --

 3          THE COURT:  And it says --

 4          MR. LEARNER:  But --

 5          THE COURT:  -- and I'm quoting, "The Refuge Act uses

 6     different words to describe the standard that different potential

 7     actions must meet."  And then it says "An inquiry into whether a

 8     land exchange is," quote, "suitable," unquote, "under the statute

 9     may differ from the compatibility analysis for the right-of-way

10     permit."

11          So according to the Seventh Circuit -- and you're going to

12     get the same panel.  This -- I mean, I realize I'm not the last

13     word in any of this.

14          MR. LEARNER:  Yep.

15          THE COURT:  The test is not compatibility, but rather

16     suitability, which -- and -- and this is where, perhaps, there is

17     still some room for argument -- may differ from compatibility.

18     We're all left to guess how, but, clearly, the Seventh Circuit is

19     suggesting that if only -- because a land exchange entails an

20     increase in the refuge extent, it may offset the loss otherwise.

21          So I'm required to make an examination -- more accurately,

22     the -- the federal entities are required to make an

23     examination -- of the offset.  It's not just a one-side

24     compatibility of the new power line but also what are the

25     benefits -- what is the suitability of the exchange.
```

1          MR. LEARNER:  Right.  Your Honor, let me address your

2     question directly in terms of what the Seventh Circuit did and

3     did not do.

4          THE COURT:  Right.  Don't tell me that they didn't decide

5     this issue, because I agree they didn't decide this issue --

6          MR. LEARNER:  Didn't decide the issue.  We agree --

7          THE COURT:  In fact, they haven't made any decision.  In

8     fact, essentially, they voided what I decided.  So --

9          MR. LEARNER:  Well --

10         THE COURT:  So then -- that doesn't help me.  So what's your

11    other point?

12         MR. LEARNER:  Okay.  First of all, Your Honor, what they

13    didn't have before then was the document that was a signed

14    statement of proposed land exchange between the federal agency

15    and the transmission companies.

16         THE COURT:  But what difference does that make as to whether

17    or not the stashed is different than compatibility?

18         MR. LEARNER:  Because with regard to whether they viewed

19    there as being final agency action or not, the failure to

20    disclose that document and that to be available to the Seventh

21    Circuit and to you and to plaintiffs, they might have reached a

22    different view.

23         THE COURT:  I -- I mean, I just think that's silly.  Whether

24    it should have been disclosed or not, I don't know, but that's

25    water under the bridge, and I --

1        MR. LEARNER:  Okay.

2        THE COURT:  -- probably should not start using --

3        MR. LEARNER:  Your Honor --

4        THE COURT:  -- metaphors in a case --

5        MR. LEARNER:  -- we don't --

6        THE COURT:  -- like this.

7        MR. LEARNER:  -- believe the Seventh Circuit said that a

8    land exchange and suitability is acceptable in this case.

9        THE COURT:  I think that's exactly what they said.

10        MR. LEARNER:  No, what the Seventh Circuit said is there's

11    compatibility and suitability.  They're both in the statute.  And

12    we're not going to decide exactly how they both apply.  So

13    therefore, Your Honor needs to decide.

14        And the question that they did not decide on the merits "Is

15    this subject to compatibility or does it fit within suitability?"

16    So in order to get to the question of is it a good deal or not,

17    the threshold question is "Is the transaction here that would

18    allow a power line to run through a protected national wildlife

19    refuge subject to compatibility, or does it fit within

20    suitability, the Seventh Circuit having said they both appear in

21    the statute?"  Those are both general provisions.

22        But in this statute, congress did something that was

23    important.  They were very specific -- and that's what we have up

24    on the screen -- saying that with respect to some very large

25    projects -- power lines, pipelines, et cetera -- and that's the

1      provision.  I don't need to read it.  You can see it.  You have
2      it in our briefs.  It's obviously sort of confusing.  16 U.S.C.
3      Section --
4           THE COURT:  No, no.  I --
5           MR. LEARNER:  -- 668 --
6           THE COURT:  I've got it.
7           MR. LEARNER:  -- et cetera.  What congress said very
8      specifically was for power lines, it has to be a compatibility
9      determination.  The Seventh Circuit did not address that point.
10     The Seventh Circuit didn't call balls and strikes on that one.
11     They said they weren't making a decision.  And, Your Honor, as
12     you know, cardinal rule of statutory construction -- the specific
13     trumps the general.  So two general provisions here -- one on
14     compatibility; one on suitability -- by which they're trying to
15     do the land exchange.

16          THE COURT:  But you're not disagreeing that part of the
17     compatibility analysis includes what benefits may have been
18     conferred by the land exchange?

19          MR. LEARNER:  Your Honor, that mixes and matches in a way
20     that we don't think is consistent with the statute.
21     Compatibility is defined, and that is whether something has a
22     material impact; okay?  It's a wildlife-dependent decision.  And
23     whether something's compatible or not doesn't turn on net
24     benefits.  Whether it's compatible or not has a statutory
25     definition that I just put up on the screen.  That's the

1    compatibility determination.

2        If Your Honor were to decide that the specific language in
3    the statute that requires a compatibility determination applies,
4    then what Fish and Wildlife needs to do is decide whether it's
5    compatible or not.

6        And Your Honor recalls the history.  That's where they
7    began.  They began saying this requires a compatibility
8    determination.  They went down that road --

9        THE COURT:  With what you view to be an end-run --

10       MR. LEARNER:  And -- well --

11       THE COURT:  -- to an exchange.  And I'm just trying to --

12       MR. LEARNER:  Right.

13       THE COURT:  -- make sense of your position against the
14   language of the Seventh Circuit's opinion, which seem to endorse
15   Fish and Wildlife Services' recent opinion that land exchanges do
16   not require compatibility determinations, but that their
17   conservation benefits must outweigh identifiable harm.

18       MR. LEARNER:  That is if a land exchange is being done under
19   the suitable for disposition in a proper way and it does not
20   involve a power line where congress has spoken specifically, then
21   you get to that box.

22       Notably, the M-Opinion that the Court looked at and indeed
23   the Court was focused on not resolving the merits, but the final
24   agency action, does not address power lines.  And the reason it
25   doesn't address power lines or pipelines is because, under the

1    statute, congress has said power lines and pipelines are subject
2    to compatibility determination.  The M-Opinion dances around
3    that.  It has to because this isn't a discretionary decision by
4    Fish and Wildlife.  This is a matter of what the statute itself
5    says, and that's inescapable.
6        What should have been done here is where they started, but
7    then they found they couldn't satisfy the standard.  They should
8    have determined whether the power line specified by congress,
9    requiring a compatibility decision -- determination was
10   compatible or not.  Fish and Wildlife hasn't done that.
11       So we're not in a situation here, Your Honor, where we're
12   looking at an administrative record where Fish and Wildlife has
13   decided it is or isn't compatible for whatever combination of
14   reasons.  Fish and Wildlife withdrew what it did before on that,
15   as Your Honor recognized in your opinion.  They tried to then say
16   it was a maintenance exception, but you can't really say they
17   didn't meet the definition of "maintenance," as Your Honor
18   recognized.
19       Fish and Wildlife has not done what the statute requires,
20   which is compatibility determination.  We're not here before Your
21   Honor arguing that their compatibility determination is, in our
22   view, arbitrary and capricious.  That determination has not been
23   made.  They debated --
24       THE COURT:  I understand.
25       MR. LEARNER:  -- it for the reason you said.

1          THE COURT:  You said that three times.

2          MR. LEARNER:  Thank you, Your Honor.

3          THE COURT:  This is probably a good time to go back to you,

4     Ms. Wilson.

5          MS. WILSON:  May I clarify a few points?

6          THE COURT:  You may.

7          MS. WILSON:  The section that plaintiffs' counsel put on the

8     screen discussing power lines is within subsection (d), which

9     relates to right of ways and uses of the refuge.  The exchange

10    authority is in subsection (b), and that was untouched by the

11    1997 Refuge Improvement Act.

12         Plaintiffs' counsel --

13         THE COURT:  I don't know which way that cuts, though,

14    because the reality is that there's going to be a power line put

15    through this exchanged land, and it seems to be the position is

16    that I should ignore that.

17         MS. WILSON:  The ex- --

18         THE COURT:  But that's not a consideration in either the

19    assessment of suitability, because there's no right of way at

20    issue.

21         MS. WILSON:  The exchange provision does not have any

22    qualifiers for how the exchanged property will be used.  The

23    M-Opinion says that the Fish and Wildlife Service should consider

24    how the exchanged property will be used in its net benefit

25    analysis, and that occurred here.  But the statute and the agency

1    guidance do not require a compatibility determination with

2    respect to a land exchange.  That is only for uses on the refuge.

3        THE COURT:  And so I should ignore the elephant in the room,

4    allow the agency to proceed to assess a land exchange under a

5    suitability test, even though we all know that what's really

6    going on is a power line is going to go through the middle of the

7    refuge.

8        MS. WILSON:  And there's already a power line there, and

9    the -- the Fish and Wildlife Service did not ignore that this

10   parcel would be used for a transmission line.  It evaluated the

11   net benefits of having the transmission line co-located with a

12   road versus a larger transmission line through the utility's

13   existing easements and determined that, on balance, this exchange

14   is in the benefit of the United States and the refuge overall.

15   You have to look at the refuge and the land exchange in -- in

16   their entirety.  You can't just look at the --

17       THE COURT:  But that would seem to --

18       MS. WILSON:  -- isolated pieces.

19       THE COURT:  But that would seem to suggest that there should

20   be a compatibility analysis done.

21       MS. WILSON:  No, Your Honor.  It's a net benefit analysis.

22   It's a different --

23       THE COURT:  Well, no --

24       MS. WILSON:  It's different --

25       THE COURT:  -- you've said that, but there is this provision

1    which specifically talks about use of grants, easements, and --

2    across or upon, through or under areas within the system for

3    purposes of such, which seems to suggest that the Fish and

4    Wildlife did need to make a compatibility determination for this

5    new larger power line.

6        MS. WILSON:  I'm sorry.  The new power line I was referring

7    to is -- is -- let me back up.  So this -- this provision on

8    power lines is example of uses.

9        THE COURT:  Right.

10       MS. WILSON:  There is no compatibility analysis that would

11   be required whether or not the Fish and Wildlife engaged in an

12   exchange because the utilities have an existing easement.  If

13   they didn't -- if the exchange does not close, the utilities have

14   said that they will pursue using that existing easement for their

15   project and a --

16       THE COURT:  Well, but that's what they were --

17       MS. WILSON:  -- compatibility analysis --

18       THE COURT:  -- doing and --

19       MS. WILSON:  I'm sorry?

20       THE COURT:  -- and they abandoned that approach.

21       MS. WILSON:  I think that is an alternative.  They have not

22   abandoned that approach.

23       THE COURT:  Well, they were proceeding down that road, which

24   required a -- a compatibility analysis.

25       MS. WILSON:  A compatibility analysis is not required for

1    preexisting easement rights.  The utilities companies in the

2    Stoneman crossing have preexisting easement rights that they have

3    said that they will pursue if the land exchange does not close.

4         What was required here under the Refuge Act for exchanges is

5    a determination that, on balance, to -- looking at the refuge as

6    a whole -- that the exchange is in the best interest of the

7    refuge, that it comports -- it provides a net conservation

8    benefit.  Fish and Wildlife Service considered the significant

9    benefits of acquiring the Wagner parcel, having the Stoneman

10   crossing restored.  That's extremely sensitive habitat -- having

11   that restored, those transmission towers removed, and co-locating

12   fragmentation.

13        There is already an existing information line there.  This

14   land exchange would allow the existing one to come down and the

15   new project to be co-located along the road.  The exchange

16   property is not this pristine environment, and there's a gravel

17   road down the middle of it.  It is not -- has little to no

18   wildlife habitat.

19        THE COURT:  The problem with that is both sides represent

20   diametrically opposed visions of that, and I don't have an

21   administrative record to decide which is right.

22        MS. WILSON:  I think there's a distinction between talking

23   about the Turkey River bottom's area in general, which is a much

24   larger area, and this exchange property, which is the road and

25   the surrounding area that has --

1        THE COURT:  Which is -- which is, again, a fine

2    representation, but I don't have the administrative record to

3    decide if you're right or they're right.

4        MS. WILSON:  At this stage, Your Honor, this is not a merits

5    determination.  This is -- this is whether they have shown that

6    there's -- there -- there's a -- made a strong showing that

7    they're likely to succeed on the merits.

8        And, Your Honor, the -- as I mentioned at the earlier part

9    of the hearing --

10        THE COURT:  The difference is I've already concluded that

11    there's substantial reason to believe that a larger power line is

12    going to have significant environmental impacts.

13        MS. WILSON:  And the impacts were analyzed in the EIS.

14        THE COURT:  That's -- so you say, but I don't have the

15    administrative record.

16        MS. WILSON:  You have the administrative record from the

17    prior cases, and -- and the United States did lodge that with

18    this case.  So it's available for review.

19        THE COURT:  I still don't have the record that you tell me

20    the Wildlife relied upon and was created between September or

21    October of last year and February of this year which resulted in

22    the decision that was made by Fish and Wildlife.

23        MS. WILSON:  I think there's an important distinction.  So

24    the EIS that was completed in 2019, which is part of the record

25    in the prior cases and has been lodged in this one, looked at the

1    impacts of putting a transmission line in this area.  The only

2    thing that changed is -- is the supplemental environmental

3    assessment looked at whether that was accomplished by a land

4    exchange or as compared to the right-of-way permit that was

5    analyzed in the EIS.  The impacts are --

6         THE COURT:  The latter of which I found to be inadequate.

7         MS. WILSON:  Related to the purpose and need.

8         THE COURT:  Right.

9         MS. WILSON:  At this stage of the litigation, plaintiffs are

10   only challenging the land exchange.  The land exchange was not

11   before this Court in the prior case.

12        THE COURT:  You can't have it both ways.  You can't tell me

13   that I can just rely on the earlier record, which I found was

14   inadequate, and don't need to look at the new record and then

15   tell me that this was a new -- this was a new consideration --

16   the land exchange -- and so I can't rely on the last -- on the

17   earlier record.  You're just talking in circles.

18        MS. WILSON:  They're two different issues, Your Honor.  The

19   EIS --

20        THE COURT:  So you say.

21        MS. WILSON:  -- looked at the impacts of the physical

22   transmission line, the impacts in the --

23        THE COURT:  I understand that, Counsel, and I found that to

24   be inadequate.  So I don't know how that helps you.

25        MS. WILSON:  But plaintiffs haven't alleged --

```
 1          THE COURT:  In any event, you're telling me it doesn't
 2    matter, because now I'm dealing with a land exchange, and I have
 3    to look at the benefits of the land exchange, which was not
 4    before me last time.  So I still need an administrative record
 5    considering the land exchange.
 6          MS. WILSON:  For a merits determination, yes, Your Honor.
 7          THE COURT:  Well, you seem to think that everything that's
 8    gone before doesn't at least raise substantial concerns with
 9    respect to the placement of a major power line on this exchanged
10    land, and I don't know how I ignore that.  It's the -- repeatedly
11    the elephant in the room.
12          It seems -- and perhaps this is where I should hear with
13    Ms. Learner [sic] because I think their brief argues it more
14    directly.  What you're saying for the government is that it
15    doesn't matter how the land is going to be used for a power line,
16    that the only consideration is whether there is an improvement in
17    the land exchange.
18          MS. WILSON:  I did not say that, Your Honor.  And the Fish
19    and Wildlife did consider how this exchanged property would be
20    used and that it would be used for a transmission line.
21          THE COURT:  When did they do that?
22          MS. WILSON:  It's in the net benefit analysis.  It's in -- I
23    believe it's also in the FONSI.
24          THE COURT:  Which means they relied upon whatever the
25    administrative record was before them in making the net benefit
```

```
 1        analysis?

 2            MS. WILSON:  I'm not sure I follow.

 3            THE COURT:  I'm not sure I do either.

 4            Ms. Learner [sic], do you want to expand on this?

 5            MS. BOSSHARDT:  Ms. Bosshardt.  Yes.

 6            THE COURT:  I apologize.

 7            MS. BOSSHARDT:  No worries.

 8            THE COURT:  Thank you.  Ms. Bosshardt.

 9            MS. BOSSHARDT:  I think to answer Your Honor's question

10        about, you know, how do you know that this land is going to be

11        exchanged that -- you know, the strip that is currently Oak Road

12        going to fairy -- how do you know that that's not suitable

13        habitat?  And the reason is because it is documented in that net

14        benefit analysis.  That is part of what will certainly be the

15        administrative record for the summary judgment decision, and that

16        is sufficient because that is where the expert Fish and Wildlife

17        Service managers determined this road already fragments this

18        habitat.  The place where the utilities currently have their

19        high-voltage transmission lines is in a more heavily forested

20        area, and they would be removed as a result of this land

21        exchange, which is one of the reasons that this land exchange is

22        so beneficial to the refuge as a whole.

23            I just wanted to touch on a few other things that came up.

24        And I --

25            THE COURT:  Before you do, though, that doesn't seem to
```

1    suggest that the Court -- and I understand that the argument is,

2    at this point, I can look at the net benefit analysis and find

3    that was adequate --

4        MS. BOSSHARDT:  And the FONSI.

5        THE COURT:  -- and the burden is on the -- and the FONSI --

6    and the burden is on the plaintiffs to show that it wasn't, but

7    you also conceded that the administrative record for the net

8    benefit analysis -- and really for the FONSI -- is not presently

9    available to the plaintiffs.  Well, the plaintiffs -- they

10   crossed the finish line in the previous lawsuit and won on the

11   merits in the previous lawsuit.  Isn't that evidence of

12   substantial success on the merits?

13       MS. BOSSHARDT:  Your Honor, first of all, I -- I have not

14   taken any position on the administrative record.

15       THE COURT:  Well, you just got done saying that the net

16   benefit analysis depended on the -- the administrative record

17   that was created.

18       MS. BOSSHARDT:  The adequacy of the record that's before the

19   Court, but I do think that --

20       THE COURT:  It's not before the Court.  That's the problem.

21       MS. BOSSHARDT:  But the agencies articulated rationale for

22   why they decided why this is so beneficial to the refuge is in

23   the record, and it is adequate, and it is owed deference because

24   these are the Fish and Wildlife Service experts who know where

25   the best habitat is for these species, and they know that the

```
 1    Wagner parcel --

 2          THE COURT:  And had there been a full --

 3          MS. BOSSHARDT:  -- is -- has tremendous --

 4          THE COURT:  -- had there been a full opportunity for comment

 5    by the public, including by the plaintiffs, to either the FONSI

 6    or the net benefit analysis, I would have more confidence in

 7    that, but you can't undo the history of this case which includes

 8    deficient environmental examination.  And so this is -- you're --

 9    you're -- I'm just struggling, obviously, with the

10    appropriateness of my finding that the plaintiffs, who seem to

11    have done everything they can to create an appropriate record,

12    have not shown at least some likelihood of success, and I know

13    there's -- there's an argument about what that is, but --

14          MS. BOSSHARDT:  Your Honor --

15          THE COURT:  -- the environmental harm which I found already

16    is substantial, and the -- as a --

17          MS. BOSSHARDT:  There is a --

18          THE COURT:  -- weighing matter, I don't know why I wouldn't

19    at least wait to find -- to get the administrative record and

20    allow the plaintiff an opportunity to at least comment on the

21    administrative record before I give deference to Fish and

22    Wildlife, who seems to have been bouncing back and forth as to

23    what is required.

24          MS. BOSSHARDT:  They have documented -- well documented the

25    rationale for finding that the exchange meets the requirement in
```

1    the M-Opinion, which Your Honor did not have the benefit of

2    before in the prior round of litigation, but which the Seventh

3    Circuit had, and which they cited, I believe, immediately

4    following the passage that you --

5        THE COURT:  No, I'm aware.  Yep.

6        MS. BOSSHARDT:  By the way, plaintiffs say that the

7    M-Opinion dances around a requirement for a compatibility

8    determination.  On page 2, the statutory text structure and

9    legislative history of the administration and improvement acts

10    demonstrate that Refuge Act land exchanges are not new uses of

11    refuge system lands that require a compatibility determination.

12    That's page 2.  It's not danced around at all.

13        I do also have to address the tower height because

14    plaintiffs have misleadingly said that that has been a moving

15    target.  We have never -- and Fish and Wildlife Service has never

16    taken any position other than our position today, which is that

17    those towers are 75 feet tall to coincide with the tree canopy

18    for the benefit of birds like everything else the utilities are

19    doing in the refuge.

20        THE COURT:  Is there --

21        MS. BOSSHARDT:  There is one --

22        THE COURT:  -- a 195-foot tower?

23        MS. WILSON:  There is only one that will not -- at least

24    one -- only one -- that has to be that high closest to the river

25    because of navigability concerns.  And, by the way, we -- we

1    might not have stressed this enough for the Court, but there is

2    already a 175-foot tower there for the existing line.  And,

3    again, it is that height because of the coastguards requirements

4    for something close to the river, and there is a picture of the

5    existing 175-foot-tall tower.  I believe that is in the

6    declaration of Mark Rothfork, but I can -- I can find that for

7    the Court.

8         THE COURT:  That's unnecessary.

9         MS. BOSSHARDT:  But there is no moving target, and

10    plaintiffs have consistently argued, despite the record showing

11    to the contrary, that these are 200-foot -- that there are

12    more -- that there are 200-foot towers throughout to refuge.

13    That is misleading.  They know better.

14         THE COURT:  So the tower will have a single step-up from

15    75 feet to 195 feet, or are there interim towers?

16         MS. BOSSHARDT:  No, they're 75 feet except for the one next

17    to the river.

18         THE COURT:  If I did not enjoin the land exchange, would the

19    utilities immediately proceed to build those towers?

20         MS. BOSSHARDT:  They would proceed to build the towers as

21    soon as the closing happens because this project is a vital piece

22    of transmission --

23         THE COURT:  Well, so --

24         MS. BOSSHARDT:  -- infrastructure.

25         THE COURT:  So -- so the answer's "yes"?

1          MS. BOSSHARDT:  Yes.  That MISO found to be needed 13 years
2     ago.
3          THE COURT:  Mr. Learner.
4          MR. LEARNER:  Your Honor, let me tick off a couple of points
5     that you asked counsel.  Counsel for the federal defendants said
6     we weren't challenging on NEPA grounds.  Count 4 of our complaint
7     is NEPA.
8          THE COURT:  I don't think they were questioning whether
9     you're attempting to make a NEPA challenge.  I think their point
10    was that it's been satisfied.
11         MR. LEARNER:  I'm sorry.  It's what?
12         THE COURT:  It's been satisfied here by virtue of the
13    suitability analysis, and the parties just disagree as to --
14         MR. LEARNER:  Your Honor, you understand our argument.
15         THE COURT:  I do, and you don't need --
16         MR. LEARNER:  I won't --
17         THE COURT:  -- to repeat it.
18         MR. LEARNER:  -- repeat it.
19         THE COURT:  Yeah.
20         MR. LEARNER:  With regard to the M-Opinion that was just
21    mentioned, the M-Opinion says that land exchanges are not uses.
22    But as Your Honor has explained, that's simply an evasion of what
23    the statute says.  The statute says compatibility determinations
24    for all new uses and specifies power lines.
25         There's a sequencing issue here in terms of understanding

1    the legislation and the history.  The suitability for disposition

2    provision predated 1997, and it was a source of the problem that

3    congress identified that Your Honor pointed to in your January of

4    '22 opinion that that was being used to carve up the

5    wilderness -- wildlife refuges, that -- the death of a thousand

6    cuts that was referred to.

7        So what did congress do in 1997?  Congress sought to tie the

8    hands of the Fish and Wildlife Service's discretion.  Congress

9    said compatibility applies to new uses and with regard to

10   specific new uses, got beyond the general.  Here, on the one

11   hand, suitability for disposition, general compatibility,

12   general -- congress said something very specifically, which the

13   Seventh Circuit didn't address -- that for power lines -- boom --

14   must be compatibility.  Your Honor has just already explained why

15   they're attempting to evade that.  I won't repeat that.

16       THE COURT:  In your view, then, that also answers the

17   ability -- or the need for a compatibility determination, even if

18   the utilities were to proceed under their existing easement?

19       MR. LEARNER:  That's correct, Your Honor, because -- let's

20   go to what congress also said -- because congress was trying to

21   not open up another loophole.  Congress said Fish and Wildlife

22   cannot allow a permit for a new use of a refuge that expands,

23   renews, or extends an existing use of the refuge.  So what

24   they're proposing to do on what they called the "Stoneman

25   line" -- that's a low power line -- it -- I'm sorry.

 1    Low-voltage -- low-voltage power line -- they're looking to

 2    replace it with a high-voltage power line --

 3        THE COURT:  Which would be a new use.  That's your argument.

 4    And I --

 5        MR. LEARNER:  Correct.

 6        THE COURT:  -- I just wanted to confirm --

 7        MR. LEARNER:  It would --

 8        THE COURT:  -- that's your position.

 9        MR. LEARNER:  -- expand -- to be more specific, Your Honor,

10    as we have flashed on the slide -- it would expand, renew, or

11    extend an existing use of the refuge.

12        The Stoneman line was pre-1997.  It was grandfathered.  And

13    what congress tried to do in the statute was not allow another

14    loophole to be created where, oh, you could take some old low

15    power line with low towers, and then put in something big and

16    tall.  And that's what they're proposing to do here.

17        They would have tall towers -- that's what they say.  I

18    don't know the exact height.  They say "tall" or "very tall"

19    towers.  It would be expanding or extending or renewing an

20    existing use of the refuge.  There has to be a compatibility

21    determination on that.  That's the statutory section that we have

22    before the Court here.  16 U.S.C. Section 668dd(d)(3) --

23        THE COURT:  You don't need to repeat it.

24        MR. LEARNER:  Okay.  I know they're -- so counsel referred

25    to the suitability being in a different section of the statute.

1        Subparagraph (e).  This is (d).  This is what congress added in
2        1997.  And there's also -- we've quoted in our brief.  I won't
3        repeat it here -- about getting rid of nonconforming uses.

4            So there was an old line that was grandfathered pre-1997.
5        This is akin to, you know, there's a corner store in a
6        residential neighborhood where somebody has had it grandfathered
7        in even though it doesn't meet the zoning, and now they come in
8        and say, "Well, since it's been grandfathered in, we want to put
9        up a big-box store -- you know, a vertical big-box store."  You
10       can't do that, and that's why congress closed that loophole.

11           Fish and Wildlife keeps saying there's nothing we can do if
12       the transmission companies want to take the Stoneman crossing,
13       put their very tall towers, and go there.  Yes, they can.  That's
14       what congress has said in the statute.

15           This isn't about the Fish and Wildlife Service's discretion.
16       We're not on the arbitrary and capricious side.  We're on the
17       side of they're not following the law that congress passed.  And
18       indeed in the M-Opinion, they recognized that the M-Opinion may
19       well not be consistent with Your Honor's decision in January of
20       2022.  They don't flatout say "Judge Conley was wrong."  They
21       recognize, and they put it nicely, that -- here it is at page 8
22       of the M-Opinion -- that they don't, in effect, think -- the
23       conclusions here, quote, "are arguably at odds with this
24       decision."

25           THE COURT:  Which I guess brings me back to the question,

1      however polite it may be, is whether or not, between Fish and

2      Wildlife and Judge Easterbrook's decision, I have been corrected

3      as to the requirement for compatibility.

4            MR. LEARNER:  Your Honor, I don't believe so --

5            THE COURT:  And I understand the argument.

6            MR. LEARNER:  You got my argument.

7            THE COURT:  Yeah.

8            MR. LEARNER:  Seventh Circuit did not get -- the Seventh --

9            THE COURT:  You don't need to repeat it.

10           MR. LEARNER:  I understand, Your Honor.

11           THE COURT:  I'll hear anything more for the defendants.

12           MS. WILSON:  Plaintiffs' counsel said that the Stoneman

13     crossing transmission line was grandfathered, but that's actually

14     incorrect.  The Stoneman crossing transmission line easement

15     rights were granted before this was even refuge.  So it's not

16     that it predates the 1997 act --

17           THE COURT:  It predates the refuge acts.

18           MS. WILSON:  -- it predates -- and so the Fish and Wildlife

19     has no ability and no authority to control how they use their

20     preexisting easement rights.  It cannot impose a new

21     compatibility analysis to change how that easement is used.

22           THE COURT:  And I'm -- I'm confused about this, and this

23     raises a whole 'nother aspect of constitutional law, but why

24     couldn't congress, since power lines are on notice that they're

25     subject to changes and regulation --

1          MS. WILSON:  Because the United --

2          THE COURT:  -- have been imposed -- just let me finish --

3          MS. WILSON:  Sorry.

4          THE COURT:  -- the question -- have imposed a new

5     requirement with respect to power lines in '97 that required

6     specific compatibility determinations for that new use with a --

7     with a larger power line?

8          MS. WILSON:  The United States -- when the United States

9     acquired fee title of that land, it took subject to the easements

10    that were already in place.

11         THE COURT:  Again, why couldn't -- this -- I mean, this is

12    really a -- a takings issue.

13         MS. WILSON:  Yeah, it would get into --

14         THE COURT:  And it --

15         MS. WILSON:  -- a takings issue.

16         THE COURT:  But it's not clear that industries that are

17    heavily regulated -- and this has been litigated to the Supreme

18    Court for automobile manufacturers and for others -- that they're

19    not on notice that congress has the power to further regulate.

20    So I don't know that it constitutes a taking.  It may, but that's

21    yet another area where there are colorable arguments for both

22    sides.

23         MS. WILSON:  I think the -- the regulations and the statute

24    are -- are clear with respect to rights of way -- strike that.

25         THE COURT:  What is it that -- what is it that you think

1    says -- that there is no ability of congress to regulate power

2    lines on an existing easement?

3        MS. WILSON:  Because those property --

4        THE COURT:  Clearly, they can regulate it.

5        MS. WILSON:  Those property rights existed prior to the

6    United States having fee ownership, and it does get into a

7    regulatory takings issue to then dictate and narrow the -- the

8    property -- it would narrow the property rights with which the

9    utilities could ex- -- could exercise.  It would --

10        THE COURT:  So there is no ability under the Refuge Act or,

11    more importantly, I guess, under NEPA for this purpose, for the

12    government to regulate any power line that goes through the

13    existing easement?

14        MS. WILSON:  That's not what I said.  It's specific --

15        THE COURT:  It seemed like what you said --

16        MS. WILSON:  It's specific --

17        THE COURT:  Because it would be a takings.

18        MS. WILSON:  It's specific to this easement rights that

19    predate refuge.  It's different --

20        THE COURT:  I'm sorry.  Did I not say "predated the Refuge

21    Act"?  I still don't believe that that's the law.  There may be a

22    takings claim.  I don't know.  But it doesn't mean that it

23    couldn't be regulated, and congress arguably did just that

24    when -- when they made -- called special attention to the use of

25    power lines.

1          MS. WILSON:  And I'm sorry.  I'm trying to make the

2     distinction between easement rights that the United States came

3     to in acquiring land, and -- and easements that the United States

4     granted.  Easements the United States granted are subject to the

5     compatibility analysis, and that compatibility review.  It is not

6     the same where the United States came to the easement.

7          THE COURT:  Understood.

8          And, Ms. Learner [*sic*], you seem eager to make --

9          MS. BOSSHARDT:  "Bosshardt."

10          THE COURT:  -- another point.

11          MS. BOSSHARDT:  Sorry.  Thank you.

12          THE COURT:  No, that's fine.  Go ahead.

13          MS. BOSSHARDT:  So --

14          THE COURT:  I was going to give you a chance anyway.

15          MS. BOSSHARDT:  I know.  I know.  So Lot 1, which is --

16          THE COURT:  And I'm sorry.  I keep doing this.

17     Ms. Bosshardt.

18          MS. BOSSHARDT:  Yes.  Thank you.

19          Lot 1, which is part of the utilities' existing easement

20     here was acquired by Fish and Wildlife Service in 1999, subject

21     to those easements.  They weren't originally, but, you know,

22     plaintiffs' counsel has said, "Oh, this is the boundaries that

23     congress chose in 1924."

24          The refuge has expanded significantly.  Refuges expand and

25     they liberally use their acquisition and exchange authorities to

1    do so.  But if this Court were to find that these easements,

2    which the government agreed to when it purchased the land, are no

3    longer good, that would be a significant disincentive to anyone

4    ever parting with property again to be part of a wildlife refuge.

5         THE COURT:  Well, I wouldn't be finding they're no longer

6    good.  I'd be finding that they may still be subject to

7    government regulation.

8         MS. BOSSHARDT:  Well --

9         THE COURT:  And in this case, regulation on the height of

10   the power lines that are put across that easement.

11        MS. BOSSHARDT:  These power lines -- the structures that are

12   going in comply with all applicable legal requirements.

13        THE COURT:  Well, they do if you're right that NEPA doesn't

14   require a full environmental impact statement.

15        MS. BOSSHARDT:  A net benefit -- so NEPA --

16        THE COURT:  We don't need to go back around on this

17   argument --

18        MS. BOSSHARDT:  I want --

19        THE COURT:  -- but I take your point.

20        MS. BOSSHARDT:  I did want to -- also, I have a photo.  I

21   don't know if I can bring it to the Court or --

22        THE COURT:  You can easily put it if you --

23        MS. BOSSHARDT:  Okay.

24        THE COURT:  I shouldn't say "easily."  But if someone would

25   assist by just allowing you -- you have to raise the arm -- just

1     all the way up.  Just keep going.  Now it's on.  And then --

2          MR. LEARNER:  Here, I'll pull ours off.

3          THE COURT:  You don't need to.

4          MR. LEARNER:  Okay.

5          MS. BOSSHARDT:  By the way, another thing I wanted to

6     mention for the Court's benefit before I come back to this is the

7     ability -- the provision authorizing Fish and Wildlife Service to

8     grant rights of way for power lines, pipelines, and roads has

9     existed since 1966.  It was not added in 1997.  So that is

10    another way in which congress could have, but did not, you know,

11    amend the two separate provisions of the Refuge Act governing

12    exchanges on the one hand and rights of way for third-party uses

13    on the other.  And there are twenty -- twenty --

14         THE COURT:  And you wanted to make a point on the --

15         MS. BOSSHARDT:  Yeah, I'm sorry.  So this is a photograph

16    that is attached to the declaration of Rodley Pritchard, which

17    we've submitted in support of the public interest in -- in the

18    exchange.  This shows the area of Oak Road where the new

19    transmission lines would go once the -- I'm sorry -- concurrently

20    with the old transmission line being removed from the

21    more-heavily-forested area that would then offer greater habitat

22    connectivity in that area.

23         THE COURT:  All right.  Mr. Learner, I'll give you the last

24    word.

25         MR. LEARNER:  Okay.  Your Honor, I'll start with specifics

1    and then go to the broader request.  Clearly, the 1997 act did

2    much more than Ms. Bosshardt has just said.  Your Honor discussed

3    that in your opinion in January of 2022.  I won't repeat it here.

4         THE COURT:  Thank you.

5         MR. LEARNER:  These statutory provisions make clear what

6    should happen, namely a compatibility determination on a power

7    line.  With regard to the Stoneman crossing -- with all due

8    respect -- that's not before the Court right now in the sense of

9    that that's not what's being --

10        THE COURT:  Well, it is -- it is --

11        MR. LEARNER:  -- proposed.  It's in the background.  I get

12   it.

13        THE COURT:  It's not just in the background.  It is a part

14   of the consideration for Fish and Wildlife if they -- that it

15   would be a worse result than the one currently under

16   consideration.

17        MR. LEARNER:  Your Honor, that's fair.  But, again, there's

18   no final agency action on that.  There's no record on that.

19   It -- it doesn't --

20        THE COURT:  No, but it's --

21        MR. LEARNER:  We -- we get --

22        THE COURT:  I don't know that it needs to be.  Not to -- I

23   think it's appropriately considered, but --

24        MR. LEARNER:  Okay.

25        THE COURT:  -- this is going to be an issue.

1      MR. LEARNER:  Okay.  And we believe -- we'll stand on what
2  we've said about what the 1997 legislation does -- expand, renew,
3  or extend an existing use.  Congress sought to close that
4  loophole, and Fish and Wildlife service is bound, obviously, but
5  what congress specifically said.

6      THE COURT:  Unless they're right that that is a preexisting
7  easement that allows them to replace those lines without
8  regulation by NEPA.

9      MR. LEARNER:  Well, Your Honor, I don't know of anything
10  that Fish and Wildlife has done where they've gone to congress
11  and said that provision that you enacted -- you can't do it.
12  That is the law.  If Fish and Wildlife Service believes it's
13  somehow unconstitutional -- either overall on its face or as
14  applied -- they certainly ought to raise that argument.  They
15  haven't.  That law has been in effect now for --

16      THE COURT:  Well, they did today, but go ahead.

17      MR. LEARNER:  Well, it's been in effect for 27 years.

18      THE COURT:  No, I understand.

19      MR. LEARNER:  And let's say that that constitutional
20  argument has not been made to the best of our knowledge.

21      We respect your point about the administrative record.  You
22  understand our point about the evasion that's going on here.
23  Your Honor's already recognized that in your 2022 opinion, and we
24  come back to the core matter.

25      Today, we're before Your Honor on a preliminary injunction.

1    Or, to be more precise, extending the preliminary injunction that
2    you issued yesterday until such a time as there can be a decision
3    on the merits.  And with regard to that, whether it's some or a
4    reasonable likelihood of success or different formulations, we
5    believe we've met that.  Your Honor's already found that in your
6    '22 opinion.  Your Honor's already found irreparable harm in your
7    previous preliminary injunction decision.  The balance of harms
8    weigh in our favor, and congress has defined the public interest
9    here.

10    The preliminary injunction that you entered yesterday is
11    necessary.  It's vital.  It's important so that the arguments
12    that are being made by the parties are based on, as you said, an
13    administrative record and one in which there's an opportunity for
14    plaintiffs to really review, and we believe, under NEPA, we had a
15    right to comment on these documents that got popped on us without
16    an administrative record, absolutely no public comment on the
17    February 23rd documents, which, in our view -- and we explained
18    this in our brief -- are not consistent with some of the other
19    positions that Fish and Wildlife historically has taken.

20    The Seventh Circuit opinion stressed the importance of an
21    administrative record.  One of the reasons they said there wasn't
22    final agency action was they didn't know what the agency was
23    going to do.  They didn't have the availability of the statement
24    of proposed land exchange -- which is exactly the same, two years
25    later, that they went forward with -- nor do the Seventh Circuit,

1    not knowing what Fish and Wildlife was going to do.

2         At that point, the Court said there needs to be an

3    administrative record.  The Court stressed that a couple of

4    times.  Nor did the Court decide compatibility or suitability

5    what the Court said, as Your Honor recognizes.

6         Those are two different standards under the statute.  We're

7    not resolving the issue on the merits.  And that is for Your

8    Honor to resolve.  We believed that nothing --

9         THE COURT:  And you don't need to repeat your entire

10   argument.

11        MR. LEARNER:  Yeah, nothing is --

12        THE COURT:  I said I'd let you have the last word.  I didn't

13   mean start over again.

14        MR. LEARNER:  Okay.  Your Honor --

15        THE COURT:  Is there anything else --

16        MR. LEARNER:  -- I'll wrap it up --

17        THE COURT:  -- you want to add to the --

18        MR. LEARNER:  -- three sentences.

19        THE COURT:  Yeah.

20        MR. LEARNER:  Grant or continue the preliminary injunction.

21        THE COURT:  I got that, yeah.

22        MR. LEARNER:  Direct the parties to produce the

23   administrative record.

24        THE COURT:  I got it, yep.

25        MR. LEARNER:  And direct the parties to meet and confer and

```
 1      develop a briefing schedule on a summary judgment consideration
 2      by the Court that's pegged to, when the administrative record
 3      becomes available, and we commit to work with the opposing
 4      counsel --
 5          THE COURT:  Yeah, I'm going to meet you half way.  I'm --
 6      I'm going to continue the preliminary injunction until an
 7      administrative record has been produced to the Court.  I'll give
 8      both sides 30 days from receipt of that record to supplement
 9      their briefing as to why the record is sufficient to support the
10      FONSI and the net benefit analysis.  And relatedly, because I
11      really haven't had this, I'm going to ask you to proceed with
12      specific briefing as to the notice and opportunity comment
13      requirements.
14          If I understand the government's position today, no such
15      obligation exists.  If I understand the plaintiffs' position
16      today, there should have been another notice and opportunity to
17      comment once the FONSI and the actual land-exchange agreement and
18      net benefit analysis was issued.  And so plaintiffs may have 14
19      days to file their brief addressing exactly that right and where
20      you think it exists in the administrative -- in the regulations
21      or the statutes, and I'll give 10 days for the defendants to
22      respond to that.
23          I -- I'm not going to hold up a decision -- or continue a
24      preliminary injunction until a merits determination.  I think I
25      owe it to the defendants to address this under the preliminary
```

1    injunction standard again when I have a basis to do so.  But

2    between the findings that I made in the original lawsuit, the

3    fact that there is an arguably precipitous issuance of final

4    decisions just -- less than a month before the exchange would

5    proceed and the absence of any administrative record for me to

6    determine the adequacy of the determinations that were made with

7    respect to the FONSI and the benefit analysis is more than

8    adequate to justify a continuation of the preliminary injunction

9    until I have a better understanding of that process.

10        Anything more for the plaintiff today?

11        MR. LEARNER:  Your Honor, just one quick clarification and

12   an introduction.  When you referred to the February 23rd

13   decisional documents -- actually, what we wanted to do was an

14   opportunity to comment on what the draft is.  Now they've gone to

15   final.  We'll comment on the final.  There should have been a

16   draft for comment.  Just to be clear.

17        THE COURT:  You're -- you're -- I'm not precluding you from

18   arguing --

19        MR. LEARNER:  Got it.

20        THE COURT:  -- that the September release wasn't adequately

21   handled either, but I'm focused in particular on --

22        MR. LEARNER:  On February.

23        THE COURT:  -- on what notice and opportunity to comment was

24   required upon issuance of the February 23 --

25        MR. LEARNER:  I understand, Your Honor.

1          THE COURT:  -- materials.

2          MR. LEARNER:  Your Honor, if I might also just request the

3     Court's indulgence for one moment.  I'd like to just introduce

4     our clients who are in the room.  Jeffrey Haskett is the

5     president of the National Wildlife Refuge Association, former

6     chief of the U.S. Fish and Wildlife Refuge System.  Jennifer

7     Filipiak is the executive director of the Driftless Area Land

8     Conservancy.  George Meyer is director of the Wisconsin Wildlife

9     Federation, former secretary of the Department of Natural

10    Resources.

11         THE COURT:  Nice to have you all here.

12         MR. LEARNER:  Thank you, Your Honor.

13         THE COURT:  And thank you for your participation.

14         I'll hear the same.  Anything more for the defendants at

15    this time?

16         MS. WILSON:  No, Your Honor.  I imagine your order will

17    clarify on the -- on the dates.  Thank you.

18         THE COURT:  Anything more for the intervening defendants?

19         MS. BOSSHARDT:  Yes, Your Honor.  Thank you.

20         The plaintiffs, in their Seventh Circuit appeal, briefed the

21    merits of the land exchange.  They argued that the Seventh

22    Circuit --

23         THE COURT:  But the --

24         MS. BOSSHARDT:  -- and this Court -- --

25         THE COURT:  -- Seventh Circuit was the --

1      MS. BOSSHARDT:  -- had enough information --

2      THE COURT:  Counsel, the Seventh Circuit was the one who

3  said there isn't enough information.  I can't decide the land

4  exchange and revoke that order.  So I don't know why you're

5  raising that.

6      MS. BOSSHARDT:  Plaintiffs thought, at that point, Your

7  Honor, that they had enough detail about the land exchange.

8      THE COURT:  But the Seventh Circuit didn't.  My bosses have

9  decided there wasn't enough.  So I don't know what this has to do

10  with anything.

11      MS. BOSSHARDT:  And, again, they offered 12 pages of

12  comments on the SEA devoted exclusively to the land exchange.

13      THE COURT:  You made that -- you made that point as well.

14      MS. BOSSHARDT:  Thank you, Your Honor.  We hope -- we

15  appreciate the Court's time and hope that you will consider the

16  vital importance of this project to reliability --

17      THE COURT:  And I am, and that's why I'm not going to wait

18  until summary judgment, but rather when I have an administrative

19  record and a better understanding --

20      MS. BOSSHARDT:  Thank you, Your Honor.

21      THE COURT:  -- of the obligations of the parties, I will

22  endeavor to address --

23      MS. BOSSHARDT:  Thank you.

24      THE COURT:  -- any continuation of the preliminary

25  injunction.

```
 1          With that, we are, I believe, adjourned, and I thank you
 2     all.
 3          MR. LEARNER:  Thank you, Your Honor.
 4          THE COURT:  You're free to move about as you wish.
 5          THE CLERK:  This Honorable Court stands adjourned.
 6               (Proceedings concluded at 10:40 AM.)
 7                              ***
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1   I, PHILIP C. HARRELSON, Certified Realtime and Merit Reporter in and

2   for the State of Wisconsin, certify that the foregoing is a true and

3   accurate record of the proceedings, transcribed to the best of my

4   ability, held on the 22nd day of March 2024, before the Honorable

5   William M. Conley, District Judge for the Western District of

6   Wisconsin, and reduced to writing in accordance with my stenographic

7   notes made at said time and place.

11                          Dated this 26th day of March, 2024.

16                          /s/ Philip C. Harrelson

17                          Philip C. Harrelson, RMR, CRR
                            Federal Court Reporter

25  The foregoing certification of this transcript does not apply to any
    reproduction of the same by any means unless under the direct coal
    and/or direction of the certifying reporter.

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  April 26, 2024

*s/ Thomas C. Jensen*
Thomas C. Jensen
PERKINS COIE LLP